740 N.E.2d 54 (2000)
317 Ill. App.3d 467
251 Ill.Dec. 224
In re D.S. and D.S., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Mike Schaeffer and Paula Schaeffer, Respondents-Appellants).
No. 4-00-0496.
Appellate Court of Illinois, Fourth District.
November 22, 2000.
*55 Alan J. Novick, Jennings, Novick, Smalley & Davis, P.C., Bloomington, for Mike Schaeffer.
Charles G. Reynard, State's Attorney, Bloomington, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, Denise M. Ambrose, Staff Attorney, State's Attorneys Appellate Prosecutor, Springfield, for the People.
Justice McCULLOUGH delivered the opinion of the court:
On May 4, 2000, the circuit court of McLean County entered a permanency order, pursuant to section 2-28 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-28 (West Supp.1999)), finding, as to the prior six-month plan and services, the permanency goal for minors D.S. and D.S. of return home within 12 months had not been achieved; respondent parents had not made reasonable efforts to achieve the goal; the trial court found the appropriate permanency goal to be return home within 12 months; respondent parents had not made substantial progress toward the return home of the minors; and respondent parents remain unfit. Respondent father, Mike Schaeffer, and respondent mother, Paula Schaeffer, appeal, arguing that the trial court's findings were contrary to the manifest weight of the evidence. We agree.
Because the parties are familiar with the evidence, we discuss it only to the extent necessary to put respondent parents' arguments in context. Respondents are the father and mother of two children, twin boys, D.S. and D.S., born February 12, 1996. On April 19, 1999, respondent parents took D.S. to the emergency room of BroMenn Hospital. Dr. Joseph Novotny, an orthopedic surgeon, diagnosed D.S. with a spiral, oblique fracture of his thigh bone, a long fracture that suggested torsional-type injury to the thigh. Respondent parents offered that respondent father was doing some remodeling work in their home. Respondent father was installing a new door and had laid the door against a wall. The children were told not to play near the door. The door fell on top of D.S.
Dr. Novotny felt it appropriate that the Department of Children and Family Services (DCFS) investigate for possible child abuse because the alleged mechanism of injury, a falling door, did not match the fracture pattern.
On April 28, 1999, the State filed a petition for adjudication of wardship alleging that (1) respondent parents had abused the children because they caused to be inflicted, or allowed to be inflicted, upon D.S., a spiral fracture to his leg (705 ILCS 405/2-3(2)(i) (West 1998)); (2) respondent parents had abused the children because they created a substantial risk of injury to the minors when D.S. sustained a spiral fracture *56 to his leg (705 ILCS 405/2-3(2)(ii) (West 1998)); and (3) respondent parents had neglected the children because the family resided in an environment injurious to the children's welfare (705 ILCS 405/2-3(1)(b) (West 1998)). The trial court entered an order for shelter care, finding "a matter of immediate and urgent necessity."
On July 15, 1999, the trial court adjudicated D.S., and his twin brother, D.S., abused and neglected minors.
On November 30, 1999, the trial court entered a dispositional order adjudicating D.S. and D.S. wards of the court and appointing DCFS as their guardian. The trial court found a permanency goal of return home within 12 months appropriate and noted "the services in place are appropriate and necessary to effectuate the goal."
On December 13, 1999, respondent parents filed a notice of appeal. Respondent parents argued, in part, that the trial court's finding of abuse was against the manifest weight of the evidence and that the trial court erred in finding respondent parents unfit and entering a permanency goal of return home within 12 months.
This court held that the trial court's findings were not contrary to the manifest weight of the evidence. In re D.S., No. 4-99-1012, slip order at 6 (June 23, 2000) (unpublished order under Supreme Court Rule 23). "`A finding of the trial court is * * * against the manifest weight of the evidence only if a review of the record "clearly demonstrates" the opposite result was the proper one.'" In re M.D.H., 297 Ill.App.3d 181, 190, 231 Ill.Dec. 863, 697 N.E.2d 417, 423 (1998), quoting In re Z.R., 274 Ill.App.3d 422, 427, 210 Ill.Dec. 956, 654 N.E.2d 255, 258-59 (1995), quoting In re T.B., 215 Ill.App.3d 1059, 1062, 158 Ill. Dec. 780, 574 N.E.2d 893, 896 (1991).
Pursuant to its order of November 30, 1999, the trial court held a permanency hearing on May 4, 2000. Catholic Social Service (CSS) provided the sole evidence, a permanency report filed on May 1, 2000. Although the permanency report recommended a permanency goal of return home within 12 months and that respondent parents remain unfit, DCFS acknowledged the sole basis for the recommendation that respondent parents remain unfit was that respondent parents failed to admit that one parent, or both, abused D.S.
The report identified an initial goal, as to respondent father, that he "will receive and participate in counseling to address parenting issues and taking responsibility for his children being in substitute care." Respondent father was discharged from counseling by CSS therapist Mike McMeen on December 20, 1999. Respondent father "satisfactorily addressed any issues in counseling including those listed in the client service plan and issues brought forth by Mr. Schaeffer himself as needed." Respondent father continued to maintain that he did not deliberately cause his son's injury. He examined the incident repeatedly in counseling and insisted that he had offered every detail he could recall. The report notes that respondent father "was always willing to explore the incident." He did accept responsibility for creating an injurious environment for his children and that, upon his son's injury, he and his wife first put the children into their pajamas before leaving for the hospital.
The report identified a second goal, as to respondent father, that he "agrees to attend parenting classes and demonstrate what he has learned during family visits." Respondent father successfully completed "Nurturing Parenting" classes. He voluntarily completed American Red Cross first aid, and child, infant, and adult CPR classes. Respondent father is always nurturing and caring toward his children. He attends every meeting, conference, and medical appointment with his children whenever possible. Respondent father continues to strengthen his parenting skills and knowledge by voluntarily seeking out educational opportunities.
*57 As to respondent mother, the initial goal noted was "Paula Schaeffer agrees to attend parenting classes and demonstrate what she has learned during family visits." Respondent mother successfully completed "Nurturing Parenting" classes. She also voluntarily completed American Red Cross first aid, and child, infant, and adult CPR classes. The report notes that respondent mother has demonstrated learned parenting skills during visits with her children. She has always been very nurturing and loving toward her children. She appears to have a very clear understanding of her children's needs and attends every meeting, conference, and medical appointment with her children.
The report identified a second goal as to respondent mother, that she "will receive and participate in counseling to address parenting issues and taking responsibility for her children being in substitute care." Respondent mother was discharged from counseling by CSS therapist Michelle Murphy on January 11, 2000. Respondent mother "satisfactorily addressed all of the issues in her client service plan goal." Respondent mother maintained that her son's injury was accidental and she accepts responsibility for deciding to put her son's pajamas on before taking him to the hospital. Respondent mother strongly stated her love for her children in counseling and her desire to be a family again. She was always cooperative and willing to address any issue.
As to respondent parents, the report identified a single goal, that "Michael and Paula Schaeffer agree to provide a structurally safe and protective living residence for their sons' return home." Respondent parents have continued to reside in their new home for the past 10 months. The report notes that they have taken every step necessary to make the home safe for their children.
Respondent parents have received two, two-hour visits per week with their children since case opening. In February 2000, their visiting plan was amended to include a four-hour visit on Saturdays. Respondent parents have attended every scheduled visit with their children.
The children question why they cannot return home. They love their grandparents but miss their father and mother. They believe their home is under construction.
The summary provides, in part:
"The Schaeffers * * * insist that they did not abuse [D.S.]. They have been adamant that they have offered every possible detail about their son's injury. The Schaeffers have been cooperative since case opening and have expressed that they will do whatever necessary to have their children returned to them. They completed parenting classes and counseling. They have pursued further opportunities to educate themselves as parents and protect their children by completing the first aid and CPR classes to become certified. [D.S. and D.S.] have become more verbal about their situation. D.S. has stated to the CSS caseworker that he was playing under the door and it fell on him. * * * Both children express wanting to return to their parents and enjoy visiting with them. Mr. and Mrs. Schaeffer continue to be cooperative. * * * [B]oth are willing to complete any other recommended services.
The Schaeffers present as very loving and competent parents. Their demeanor has always been calm and composed during their interactions with CSS staff. * * * The Schaeffers do not display outward features which would indicate an anger control problem of any type. Notably, neither of their therapists identified any such issues and the Schaeffers have completed their therapy."
The report concluded with a recommendation wholly inconsistent with the evidence presented in the report, that respondent parents remain unfit and that the children remain under the guardianship of DCFS.
*58 The CSS report further recommended a status hearing within three months in order for respondent father to complete a neuropsychological evaluation, if approved by DCFS. It appears that a neuropsychological examination has been suggested to determine if respondent father has a condition that limits his ability to recall details or if he has a type of intermittent explosive disorder. This is in sharp contrast to statements made by CSS in the permanency report that respondent parents' demeanor has always been calm and composed during their interactions with CSS staff and respondent parents do not display outward features that would indicate an anger-control problem of any type.
Ms. Judith Renner, assistant State's Attorney for the People of the State of Illinois, recommended a permanency goal of return home within five months. More important, Renner recommended that the children be returned to their parents with opportunities for intensive oversight and review. DCFS concurred. In addition, the guardian ad litem noted his approval.
The trial court responded, in part:
"[T]here is a certain amount of black and white in the way that I approach things * * *. The [c]ourt has made a ruling in this case that the evidence is that this child's broken leg was not caused by a falling door but was caused by non-accidental means. * * * And the court has made clear in the past, and it makes it clear again today, that as long as the [c]ourt is not aware of how this child was injured, as to how it happened and which adult did it and both adults still live together in the same home, the [c]ourt cannot be assured that the home, unsupervised, is safe and a nurturing place for the children. Counsel knows that is my approach in every case that I take, and that is a matter in which there can be no exception * * *."
The trial court entered a permanency order finding that, as to the prior six-month plan and services, the permanency goal of return home within 12 months had not been achieved; respondent parents had not made reasonable efforts to achieve the goal; the trial court found the appropriate permanency goal to be return home within 12 months; respondent parents had not made substantial progress toward the return home of the minors; and respondent parents remain unfit. This appeal followed.
"The trial court is given broad discretion to select a permanency goal in the best interest of the child. Accordingly, the trial court's decision regarding a permanency goal is entitled to deference and will not be disturbed on appeal unless contrary to the manifest weight of the evidence." In re K.H., 313 Ill.App.3d 675, 682, 246 Ill.Dec. 451, 730 N.E.2d 131, 137 (2000), citing In re J.H., 304 Ill.App.3d 188, 200, 237 Ill.Dec. 446, 709 N.E.2d 701, 709 (1999). The finding of a trial court is against the manifest weight of evidence if review of the record demonstrates the proper result is the one opposite that reached by the trial court. K.H., 313 Ill. App.3d at 682, 246 Ill.Dec. 451, 730 N.E.2d at 137, citing In re M.K., 271 Ill.App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74, 79 (1995).
Section 2-28(2) of the Act provides, "[i]n selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were ruled out." 705 ILCS 405/2-28(2) (West Supp.1999). Here, even considering the trial court's oral pronouncements together with its written order, the trial court failed to comply with the procedural mandates of section 2-28(2) of the Act.
It appears that the sole basis for the trial court selecting the permanency goal, return home within 12 months, and ruling out the preceding goals, was that the trial court believed the child's broken leg was not caused by a falling door but was caused by nonaccidental means.
*59 Section 2-28(2) of the Act provides as follows:
"The court shall set a permanency goal that is in the best interest of the child. The court's determination shall include the following factors:
(1) Age of the child.
(2) Options available for permanence.
(3) Current placement of the child and the intent of the family regarding adoption.
(4) Emotional, physical, and mental status or condition of the child.
(5) Types of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed.
(6) Availability of services currently needed and whether the services exist.
(7) Status of siblings of the minor." 705 ILCS 405/2-28(2) (West Supp. 1999).
Although the permanency order indicates a finding that "the services were not successful," the permanency order does not provide for what types of services were previously offered and found "not successful" or the reasons that the services failed. Nothing was offered as to availability of services currently needed and whether the services exist.
It appears that the sole factor considered by the trial court in setting the permanency goal as return home within 12 months was failure of respondent parents to acknowledge that D.S.'s broken leg was not caused by a falling door but was caused by nonaccidental means and to identify the parent that broke the child's leg. The trial court characterized its approach as "black and white" and stated that respondent parents must provide details of this incident that conform with the trial court's beliefs or the children will not be returned to their parents and that this is an "approach" taken by the trial court in every case and "there can be no exception."
Cases involving the adjudication of abuse, neglect, and wardship are sui generis, that is, each case must be decided on its own distinct set of facts and circumstances (In re J.P., 294 Ill.App.3d 991, 1002, 229 Ill.Dec. 565, 692 N.E.2d 338, 344 (1998)), and, thus, the trial court has failed to exercise its discretion. We find the trial court's seeming refusal to exercise its discretionary authority an abuse of discretion.
The trial court must also consider the permanency goal contained in the service plan. 705 ILCS 405/2-28(2) (West Supp.1999). The most recent service plan of record, filed October 26, 1999, identified a permanency goal of return home within 12 months and an achievement date of April 30, 2000. The service plan notes that the permanency goal, return home within 12 months, was chosen because respondent parents "are making progress" and it will take some time for respondent parents to complete their various goals.
The trial court also considers "the appropriateness of the services contained in the plan and whether those services have been provided." 705 ILCS 405/2-28(2) (West Supp.1999). The permanency order provided the services contained in the plan were appropriate and the services were provided.
The trial court also considers "whether reasonable efforts have been made by all the parties to the service plan to achieve the goal." 705 ILCS 405/2-28(2) (West Supp.1999). Although the permanency order provides that reasonable efforts were not made by the parties to achieve the goal, the record reflects respondent parents have worked to correct the conditions that were the basis for the removal of their children from their care.
This court is keenly aware of the element of admission of wrongdoing as important in determining fitness. However, the record in this case does not support the trial court's findings that, as to the prior six-month plan and services, the permanency *60 goal for minors D.S. and D.S. of return home within 12 months had not been achieved; respondent parents had not made reasonable efforts to achieve the goal; the appropriate permanency goal to be return home within 12 months; respondent parents had not made substantial progress toward the return home of the minors; and respondent parents remain unfit. We, therefore, hold that these findings by the trial court were against the manifest weight of the evidence.
In light of our holding that these findings by the trial court were against the manifest weight of the evidence, we need not discuss argument citing In re L.F., 306 Ill.App.3d 748, 239 Ill.Dec. 780, 714 N.E.2d 1077 (1999).
We reverse the trial court's judgment and remand the cause with instructions to the trial court to conduct a further hearing as to the custody of the children. If no further evidence is presented, the children shall be restored to the custody of their parents. The trial court shall order the parents to cooperate with DCFS and comply with the terms of an after-care plan, or risk the loss of custody of the children and possible termination of their parental rights. 705 ILCS 405/2-28(4) (West Supp. 1999).
For the reasons stated, we reverse the judgment of the circuit court of McLean County and remand with directions.
Reversed and cause remanded with directions.
STEIGMANN and KNECHT, JJ., concur.