784 N.E.2d 240 (2002)
336 Ill. App.3d 476
271 Ill.Dec. 22
In re ALICIA Z. and Zayda Z., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Jose Z., Respondent-Appellant).
In re Alicia Z. and Zayda Z., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Jose Z., Respondent, Katie Penowsky, Respondent; D.M. and E.M., Intervenors; Department of Children and Family Services, Guardian-Appellant).
Nos. 2-01-1465, 2-02-0395, 2-02-0505.
Appellate Court of Illinois, Second District.
November 7, 2002.
*242 Johathan K. Baum, Tamar T. Karsh-Fogel, Briggitte M. Girona, Jennifer C. Ryan, Katten, Muchin, Zavis & Rosenman, Diane L. Redleaf, Lehrer & Redleaf, Chicago, for Jose Z.
Meg Gorecki, Kane County State's Attorney, St. Charles, Martin P. Moltz, Deputy Director, Elgin, Kristine A. Karlin, Mt. Prospect, for the People.
Laurene M. Heybach, Law Director/Chicago Coalition for the Homeless, Chicago, for Amici Curiae, Coalition International of Mexicans Abroad, Coalition of Mexican Organizations in the Midwest, Consulate General of Mexico, Illinois Coalition for Immigrant & Refugee Rights, Latino Task Force Against Homelessness, National Center on Poverty Law, National Coalition for Child Protection Reform, Polish American Association.
Gary J. Golian, Guardian Ad Litem, Dept. of Children & Family Services, Rockford, for Alicia Marie Z., Zayda Z.
Justice BYRNE delivered the opinion of the court:
Following adjudicatory and dispositional hearings, the trial court entered neglect adjudications for Alicia Z. and Zayda Z., the daughters of respondent, Jose Z., and awarded guardianship of the girls to the Department of Children and Family Services (DCFS). Respondent did not appeal the court's orders. On August 7, 2001, more than two years after DCFS was awarded guardianship and after several permanency review hearings, respondent filed a motion to modify guardianship and custody of his children. See 705 ILCS 405/2-28(4) (West 2000). On November 21, 2001, the trial court denied the motion, and respondent challenges the order in appeal No. 2-01-1465.
On April 12, 2002, the trial court transferred guardianship of the minors from DCFS to the foster parents, and respondent and DCFS each filed notices of appeal from that order. In appeal No. 2-02-0395, respondent argues that the trial court should have transferred guardianship and custody of the children to him rather than to the foster parents. In appeal No. 2-02-0505, DCFS argues that guardianship should have remained with DCFS and that the permanency goal should have been set to "return home" to respondent. In this regard, DCFS and respondent agree that the trial court erred when it set a permanency goal of private guardianship by the foster parents. The foster parents are not parties to these consolidated appeals.
We dismiss appeal No. 2-01-1465 for lack of jurisdiction. As to appeal Nos. 2-02-0395 and 2-02-0505, we conclude that the trial court's transfer of guardianship from DCFS to the foster parents is against the manifest weight of the evidence. However, we further conclude that the denial of respondent's request for guardianship and custody is not against the manifest weight of the evidence. Accordingly, we reverse the trial court's April 12, 2002, order transferring guardianship and remand the cause with directions.

FACTS
Alicia was born on February 17, 1997. DCFS took custody of her six months later when Elgin police responded to a report of a break-in and observed Alicia's mother handling the girl roughly. The mother refused to cooperate with the police and assaulted a DCFS worker the next day. Respondent and the mother were never *243 married. When the case began, Alicia lived with her mother and her maternal grandmother in Elgin. Respondent lived in Elgin and worked there and in Beloit, Wisconsin. Respondent gave the mother $50 per week for Alicia, expressed a desire to gain custody of the girl, and offered to have family members watch her while he was at work.
DCFS filed a petition for an adjudication of neglect alleging that Alicia's parents had failed to immunize Alicia and that the mother had used illegal drugs in Alicia's presence. At the September 17, 1997, hearing, respondent appeared pro se and admitted to a neglect adjudication but insisted that he would do everything he could to regain custody. DCFS recommended "return home to the parents" as the first permanency goal.
At a subsequent status hearing, the trial court told respondent that his appearance at the dispositional hearing was unnecessary if he was "willing to allow [DCFS] to have guardianship and custody in this case." Respondent did not attend the dispositional hearing. Following two hearings in October 1997, the trial court awarded DCFS guardianship of Alicia, set the permanency goal of "return home," and authorized weekly supervised visitation by the parents. DCFS placed Alicia in foster care after the maternal grandmother declined to take custody.
After the first permanency review in January 1998, the trial court permitted the parents to visit Alicia more frequently. At the April 1998 permanency review, the court found that the parents had attended parenting classes as directed, and the court directed the parents to demonstrate parenting skills during the supervised visits.
Zayda was born on May 16, 1998, and the trial court granted DCFS temporary custody after hearing evidence that the mother verbally abused hospital and DCFS staff and tested positive for marijuana when Zayda was born. Zayda was placed with Alicia's foster family. On August 26, 1998, the trial court appointed an attorney for respondent and began an adjudicatory hearing in Zayda's case. Psychologist Julia Klco testified that she evaluated the mother and respondent and observed one of respondent's visits with Alicia and Zayda. Klco stated that respondent was "extremely attentive" to Alicia and that he told Klco that he stayed with the mother for his daughters' sake. Klco recommended that respondent terminate his relationship with the mother. Klco believed that respondent could parent successfully if he received legal assistance and day care services.
Chris Hinde, a DCFS caseworker, testified that respondent was "very gentle and very delicate" when interacting with the children. Respondent attended nearly all of the scheduled visits and otherwise cooperated. However, Hinde was concerned that respondent's status as an illegal alien showed his disregard for this country's laws, including the child welfare laws.
The adjudicatory hearing was delayed because the mother initially denied that respondent was Zayda's father. A subsequent paternity test confirmed that respondent is the girl's father, and respondent readily admitted paternity.
On November 30, 1998, the court adjudicated Zayda neglected, concluding that Zayda's home environment was injurious to her welfare because Alicia was still in the custody of DCFS, the mother had been violent toward respondent, and the mother had tested positive for marijuana when Zayda was born. The trial court made Zayda a ward of the court, appointed DCFS guardian, and granted the foster parents custody. The court also changed *244 Alicia's permanency goal of return home to "substitute care pending termination of parental rights" after reviewing a report in which Hinde indicated that both parents were emotionally unstable, failed to cooperate with DCFS, and repeatedly disregarded the authority of the judicial system. Hinde noted that respondent had immigrated illegally and that respondent and the mother had been arrested repeatedly for traffic violations. Furthermore, the mother continued to vacillate between respondent and another boyfriend, and she often verbally abused respondent.
At Zayda's December 16, 1998, dispositional hearing, John Ayala, a DCFS caseworker who speaks both English and Spanish, testified to respondent's conduct during visits with Alicia and Zayda. Ayala stated that respondent had bonded with the girls and that he was very tender and very nurturing when interacting with them. Ayala believed that respondent's visits could be unsupervised if the mother did not participate in them. The court granted DCFS guardianship of Zayda and directed respondent to continue the recommended counseling, sign any necessary releases, complete parenting classes, submit to a substance abuse evaluation, and provide a safe home environment. The court permitted DCFS to schedule unsupervised visits for respondent. Nancy M., the court-appointed special advocate (CASA) and the guardian ad litem, suggested that respondent's parental rights should be terminated, and the court stated that a discussion of such a termination was premature because respondent had been denied the opportunity to reunite with the children.
At the June and August 1999, permanency review hearings, the CASA and the foster parents again recommended terminating respondent's parental rights. However, the court found that respondent had made substantial progress toward the return of both Alicia and Zayda and set the permanency goal for both girls at return home within 12 months as recommended by DCFS and the State. The court permitted unsupervised visits at respondent's home in Beloit, Wisconsin.
At a December 1999, permanency review hearing, the court reviewed a parenting assessment prepared by Patricia Voloschin-Weiner, a psychologist retained by DCFS. In her evaluation, Voloschin-Weiner stated that respondent had been prejudiced because DCFS had provided respondent with services in English even though his primary language is Spanish. She also opined that respondent possessed adequate parenting skills and that he had developed a loving relationship with his daughters. The court left the permanency goal at return home and authorized overnight unsupervised visits with respondent in Wisconsin.
In January 2000, Zayda was diagnosed with fetal alcohol syndrome (FAS), and the court ordered early intervention therapies, developmental classes, and occupational and speech therapy. By this time, DCFS was developing a plan to coordinate services with the appropriate Wisconsin agencies. Around that time, respondent learned that the foster parents baptized Alicia and Zayda in a religion other than respondent's.
On June 22, 2000, the court ordered respondent to "actively participate" in Zayda's early intervention therapies. The therapies were administered at or near the foster parents' home in Aurora, and respondent's visits were conducted at his home in Wisconsin, which was several hours away. Respondent attended the therapy sessions, but the foster parents did not allow him to participate when he occasionally arrived late. After acknowledging *245 that some hostility had developed between the parties, the court authorized the foster parents to exclude respondent from a session if he was more than 10 minutes late.
The next permanency review hearing ran from October through November 2000. Dr. Constance Blade, a pediatrician, testified that Zayda suffered from FAS but had an IQ of 100, which is in the "normal" range. Dr. Blade had never met respondent to evaluate him and his household for the appropriateness of a transition. However, Dr. Blade opined that Zayda would regress and require even more services if she left the foster parents' home permanently.
Ayala testified that respondent had ended all contact with the girls' mother. Respondent was rated "satisfactory" for the client service plan tasks of investigating Zayda's developmental delays and participating in her treatment. Respondent prepared nutritious meals for the girls and planned age-appropriate activities for them. The interpreter who participated in the sessions told Ayala that the foster parents were rude and that there was "a lot of tension in the air." Respondent and a second interpreter told Ayala that the foster parents excluded respondent from some of the sessions. Ayala concluded that respondent exceeded the minimum standards of parenting set by DCFS because he could provide shelter and food and could address Zayda's special needs. After noting that social services were in place in Wisconsin, Ayala recommended return home as a permanency goal.
David Langenstrass, Ayala's DCFS supervisor, rated respondent as "satisfactory" for his compliance with the service plan tasks. DCFS recommended that the permanency goal remain at return home because respondent had bonded emotionally with the children and developed adequate parenting skills. He also recently attended more therapy sessions than usual. Dr. Alome Stein, respondent's therapist, testified that respondent understood Zayda's FAS diagnosis and used that knowledge while interacting with his daughters.
The foster mother testified that she hired a private investigator to investigate respondent and his family. She contacted a state senator and expressed frustration that DCFS and other agencies knew of respondent's status as an illegal immigrant but had not taken any action against him.
Respondent testified that the foster parents had treated him very badly, excluding him from several of Zayda's therapy sessions after he had driven several hours from Wisconsin. Respondent acknowledged that Zayda suffers from FAS and that she requires extra attention. Respondent used games, puzzles, and toys to teach her to remain focused on tasks. He also calmed Zayda when she became disoriented, frustrated, anxious, and afraid. Respondent recently stopped attending Zayda's speech therapy sessions because no interpreter was present. Ayala told respondent that he should not participate in the sessions until the trial court reviewed the permanency goal.
On November 3, 2000, the court changed the permanency goal from return home within 12 months to private guardianship by the foster parents. The court decided that the goals of return home within five months and within one year were inappropriate because the previous goal of return home within one year had not been achieved.
The court found that DCFS had rendered adequate services since the fall of 1998 even though an interpreter did not consistently attend Zayda's therapy sessions until July 2000. The court noted *246 that respondent possessed at least the minimum parenting skills because he could feed, clothe, babysit, and shelter the children. He had made reasonable progress toward the return of the children and possessed "a rudimentary understanding" of Zayda's condition, but he had not attended all of the therapy sessions. The court believed that the FAS diagnosis was a "significant" change in the case and that Zayda would "regress" if respondent regained custody. The court believed that respondent could learn to care for Zayda but that he was unprepared to do so at that time.
On August 7, 2001, respondent filed a "Motion for Modification of the Dispositional Order of Guardianship to the Department of Children and Family Services and for Return of Custody to Father-Respondent." The trial court agreed to combine a hearing on respondent's motion with a previously scheduled permanency hearing.
Ayala testified that respondent understood Zayda's special needs but had not completed several tasks recently assigned by DCFS. The foster parents completed the "KIDS" program, but respondent attended only one session. Respondent failed to furnish holiday visitation or transportation plans, and he did not meet with a particular psychologist as directed. Ayala acknowledged that the therapists denied respondent's request to change Zayda's therapy schedule. A translator was not consistently provided at the therapy sessions, and respondent was often forced to miss work.
Respondent did not attend Zayda's therapy sessions after the court set the permanency goal of transferring guardianship to the foster parents, but Ayala believed that respondent was not required to do so. Zayda's sessions ended upon her third birthday because the Aurora school district concluded that she did not require special education. Ayala had never seen respondent treat the children inappropriately, and when someone alleged that respondent had struck the children, Ayala determined that the allegations lacked merit.
D. Jean Ortega-Piron, the DCFS guardianship administrator, recommended that the permanency goal be set at "return home" to respondent. Ortega-Piron testified that her intervention was necessary in this case because it had "really gone off track" and the children should have been returned home sooner.
Ortega-Piron concluded that DCFS was not complying with the requirement of placing children of Spanish-speaking parents in a Spanish-speaking foster home. The requirement ensures that the children can communicate with their biological parents, maintain their heritage, and acclimate to their parents' home when they return. Ortega-Piron believed that Alicia and Zayda were not fluent in Spanish because Spanish services were not provided at the start of the case. She also criticized the children's placement with nonrelative foster parents because a relative had previously volunteered to care for the children. Ortega-Piron admitted that she had not met with respondent, the foster parents, or the girls, and that she did not review the foster parents' "cultural plan."
Ortega-Piron stated that, despite the inadequacy of the DCFS services, respondent had remained involved in the children's lives since their births. Respondent had financially supported the children while they lived with their mother, and he provided for them during their weekly visits. Ortega-Piron was troubled that Zayda's therapies were held at the foster parents' Aurora home, where respondent was not welcome. Moreover, DCFS should have better accommodated respondent so *247 that he was not required to travel from Wisconsin to Aurora to attend weekday sessions beginning at 8:30 a.m. Respondent was excluded from the development of Zayda's future therapy plans. Furthermore, respondent did not attend all of the therapy sessions partly because DCFS did not clarify which sessions he was required to attend. Alicia and Zayda had not participated in the Roman Catholic Church as respondent wished. Respondent had never abused or neglected the children, and Zayda's condition was improving steadily. Respondent had difficulty "working with systems in this country," but he nevertheless diligently sought custody.
Ricardo Ruiz, another Spanish-speaking DCFS counselor, testified that he had been respondent's DCFS therapist since March 2001 and had observed respondent's visits with Alicia and Zayda. Respondent generally described to Ruiz the physical and behavioral effects of FAS, such as hyperactivity, unresponsiveness, and a lack of comprehension. However, respondent doubted that Zayda suffered from FAS. Respondent was patient with his daughters and played with them appropriately. He also cooked for them and disciplined them when necessary. Alicia and Zayda interacted well with respondent, his fiancee, and their son. Respondent usually spoke to the girls in English, but he attempted to teach them Spanish. Ruiz felt that respondent could manage Zayda's special needs, and he recommended returning Alicia and Zayda to respondent.
Dr. Blade again testified that Zayda suffered from FAS and had been "kicked out" of two day care centers for behaving badly. Zayda's condition had improved, which displayed her ability to extract and use learned information, but Zayda would probably "fail" if she did not receive additional services. Respondent was "appropriately interested" and "very concerned" about Zayda. However, Dr. Blade recommended that Zayda remain in the foster parents' home because the girl was attached to them and would have difficulty adapting to a change. Dr. Blade did not know whether respondent could care for Zayda because she had met with him only once and was unfamiliar with his child care arrangements. She acknowledged that Zayda's biological ties to respondent were important and that a transition to respondent's home was possible if respondent and his fiancee could meet "some very big emotional requirements."
Dr. Susan Echiverri, a pediatric geneticist, opined that Zayda did not suffer from FAS, fetal alcohol effects (FAE), or alcohol-related neurodevelopmental disorder (ARND). A child with FAS ordinarily has an IQ of 60 to 70 but could have an IQ as high as 120. Dr. Echiverri spent between 30 minutes and one hour assessing Zayda and recommended that Zayda continue her therapy sessions. Zayda did not exhibit the facial features or growth retardation that are typical of FAS children. Dr. Echiverri explained that Zayda's race might have contributed to the misdiagnosis. The doctor also concluded that Zayda's misbehavior was more likely caused by a behavioral disorder than by neurodevelopmental abnormalities. Zayda earned "high average" scores in expressive language and vocabulary skills, which would be unusual for a child suffering from FAS. Zayda's attention span was normal for a three-year-old. The doctor stated that, even if Zayda suffered from FAS, respondent could care for her as long as he possessed a layman's understanding of the condition and utilized available community resources.
Dr. Echiverri's diagnosis was based on an assumption that the mother had not consumed alcohol during her pregnancy. *248 The doctor hypothesized that, if the mother had consumed alcohol, Zayda's symptoms would support a diagnosis of fetal alcohol effects. The court explained that it had previously found that the mother had, in fact, consumed alcohol during her pregnancy.
Respondent testified through an interpreter that he deeply desired custody of Alicia and Zayda and wished to "help them better themselves like any father would." For the past three years the girls visited respondent in Wisconsin, where he lived with his fiancee and their son. During the visits, respondent played games with the girls, took them to the park, read them children's books in Spanish, cooked for them, and bathed them. Respondent used "time-outs" to discipline the children and never used corporal punishment. He stated that he has an extensive family network of nieces, nephews, and cousins that could help him parent the girls. At the time of the hearing, respondent worked at a supermarket, and he had driven to work for the past three years even though he obtained a driver's license less than two months before the hearing.
Respondent explained that FAS is a congenital condition caused by the mother's drinking of alcohol during her pregnancy. He acknowledged that a diagnosis of FAS would explain why things were harder for Zayda early in her life. By the time of the hearing, Zayda acted normally, and respondent gave her special attention. Respondent learned during Zayda's occupational therapy how to limit her play.
When respondent asked Ayala to reschedule the therapy sessions in Aurora, Ayala either told respondent that is was not possible or redirected the conversation. Respondent was not included in the development of Zayda's early intervention family service plans, and only some of the sessions were conducted in Spanish. Respondent stopped attending the sessions in November 2000 because he thought he was no longer required to attend them.
Respondent was very concerned that the foster parents baptized the children in the Protestant faith even though they knew that respondent is Catholic. DCFS never followed through on a promise to move the children to a Spanish-speaking home. Respondent believed that the girls' understanding of their cultural, religious, and linguistic heritage had been adversely affected.
The State called Thomas Leo, a family therapist, who evaluated respondent, Zayda, Alicia, and the foster parents separately at the request of DCFS. Respondent vigorously challenged Leo's qualifications to testify as an expert, arguing that he was unlicensed, he did not rely upon any DCFS standards in reaching his conclusions, and each of his evaluations was less than one hour long. However, the court permitted Leo to render an opinion in the case because he had significant "life experience" and had testified in juvenile cases before. Leo recommended that Alicia and Zayda remain with the foster parents and that respondent's overnight visits end.
At the evaluation, Leo spoke to the respondent in Spanish, but respondent spoke to his daughters in English. Zayda appeared to be quite impulsive, but respondent and the girls exhibited a "nice interaction." Respondent's vigilance was "more than adequate," and he met the minimal standards of parenting. However, Leo was uncertain of the degree of attachment between the girls and respondent. The foster parents understood Zayda's therapies. Leo concluded that the children's proposed return to respondent would create stress in respondent and his fiancee and would disrupt the psychological bonds the children had developed with the foster parents. Although he never *249 met respondent's fiancee, Leo concluded that she could not care for Alicia and Zayda because she was only 18 years old and had a son of her own. Leo knew that respondent never "mistreated or neglected the children," but he believed that respondent was not "positioned in a good way" for the transition and that a transition would have been easier two years earlier. Leo stated that the girls were thriving because of the foster parents' daily care.
Nancy M., the CASA and the guardian ad litem, opined that Alicia and Zayda should remain in the foster home because nothing had changed since the November 2000 permanency review. Nancy M. believed that respondent did not meet the minimal standards of parenting because he had rejected the diagnosis of FAS and denied that Zayda had special needs. Ten people told Nancy M. that respondent had struck Alicia and Zayda, and Nancy M. believed that "the hitting [had] escalated." Nancy M. stated that the foster mother is "phenomenal" and that the foster parents are a "far and away superior choice." On cross-examination, Nancy M. admitted that she had not spoken with respondent since the most recent permanency review in November 2000. Her recent information about respondent came from the foster parents, service providers, and day care providers.
Nancy M. identified reports prepared by Dr. Ira Chasnoff and Dr. Linda Schwartz of the Child Custody Center. According to the reports, the mother admitted significant drinking during Zayda's pregnancy. Dr. Chasnoff diagnosed Zayda with FAS because she exhibited neurobehavioral symptoms such as aggression, impulsivity, sleeping problems, and increased sensitivity to auditory stimuli. Zayda exhibited normal cognitive functioning when examined, but the experts predicted that her condition would deteriorate if she was not placed in a stable, nurturing home with adequate services. Dr. Schwartz reported that Alicia said respondent struck the girls when he was angry.
On November 21, 2001, the trial court denied respondent's motion to modify guardianship and custody and again set a permanency goal of awarding private guardianship to the foster parents. The court found that Zayda had special needs that were most likely caused by the mother's prenatal substance abuse. Zayda, therefore, would likely require professional therapeutic services and follow-through by the primary caretaker. Respondent had several opportunities to learn about and participate in Zayda's therapies but chose not to do so. The court concluded that the best interests of Alicia and Zayda would be served if they remained with the foster parents.
The court's November 21, 2001, permanency order was consistent with the November 2000 permanency order. DCFS retained guardianship pending the goal of transferring guardianship to the foster parents. The court entered supplemental findings that "a pattern of either negligent or purposeful misrepresentation occurred with DCFS, such as the failure to give Dr. Susan Echiverri the complete information about prenatal substance abuse." The court attributed Zayda's ineligibility for special education to successful intensive therapies. The court also downplayed the significance of the experts' conflicting diagnoses, noting that they agreed that Zayda should continue her therapy sessions. The court was most troubled by respondent's failure to participate in the sessions. Moreover, the foster parents' "cultural plan" adequately addressed respondent's concern that Alicia and Zayda were losing touch with their heritage. The court noted that any "perceived misfeasance committed by DCFS" should not be considered *250 when determining the children's best interests.
The court subsequently granted respondent overnight visitation and entered a written finding of finality pursuant to Supreme Court Rule 304(a) (155 Ill.2d R. 304(a)). Respondent also requested and received certification of an appealable question under Rule 308(a) (155 Ill.2d R. 308(a)), but this court denied his application for leave to appeal under that rule. On December 20, 2001, respondent filed a notice of appeal from the denial of his motion to modify custody, and this court docketed the case as appeal No. 2-01-1465.
On April 12, 2002, the trial court held a status hearing at which the State and the foster parents requested that the court transfer guardianship of Alicia and Zayda from DCFS to the foster parents. Respondent and DCFS objected, citing the need for the court to monitor respondent's visitation and Zayda's special services. The trial court nevertheless transferred guardianship of the minors from DCFS to the foster parents, relying only upon the evidence presented at the hearings on respondent's motion to modify custody and the concurrent permanency review. The court also closed the case, thereby ending the periodic permanency review hearings, depriving the minors of the court's supervision, and removing the statutory mechanism by which respondent's access to the children could be monitored.
On April 16, 2002, respondent filed a second notice of appeal challenging the transfer of guardianship, and we docketed the case as No. 2-02-0395. On May 17, 2002, DCFS filed its own notice of appeal from the guardianship transfer, and we docketed the case as No. 2-02-0505. The appeals have been consolidated.

APPEAL No. 2-01-1465
The trial court awarded DCFS guardianship of Alicia and Zayda on October 15, 1997, and on December 16, 1998, respectively. Respondent did not appeal those dispositional orders. However, in appeal No. 2-01-1465, respondent challenges the November 21, 2001, order in which the trial court denied his "Motion for Modification of the Dispositional Order of Guardianship to the Department of Children and Family Services and for Return of Custody to Father-Respondent." Respondent contends that this court has jurisdiction to review the November 21, 2001, order pursuant to Supreme Court Rules 301, 304(a) (155 Ill.2d Rs. 301, 304(a)), and 306(a)(5) (166 Ill.2d R. 306(a)(5)).
Section 2-28 of the Juvenile Court Act of 1987(Act) (705 ILCS 405/2-28 (West 2000)) governs court proceedings to review dispositional orders. In re S.M., 223 Ill. App.3d 543, 547, 165 Ill.Dec. 910, 585 N.E.2d 641 (1992). At least every six months, the circuit court must review the permanency goal (705 ILCS 405/2-28(2) (West 2000)) and enter a written permanency order (705 ILCS 405/2-28(3) (West 2000)). Such a modified disposition vacates the original disposition and supercedes it. In re Brandon S., 331 Ill.App.3d 757, 761, 265 Ill.Dec. 158, 771 N.E.2d 1117 (2002). A party may seek review of the permanency goal in the interim by filing a motion under section 2-28(4), which provides that "[t]he minor or any person interested in the minor may apply to the court for a change in custody of the minor and the appointment of a new custodian or guardian of the person or for the restoration of the minor to the custody of his parents or former guardian or custodian." 705 ILCS 405/2-28(4) (West 2000).
An order is final and appealable if it terminates the litigation between the *251 parties on the merits or disposes of the rights of the parties either on the entire controversy or on a separate part thereof. Blott v. Hanson, 283 Ill.App.3d 656, 660, 218 Ill.Dec. 848, 670 N.E.2d 345 (1996). Rule 301 governs appeals from cases in which a final order has disposed of the entire controversy. In re Adoption of Ginnell, 316 Ill.App.3d 789, 791, 250 Ill. Dec. 117, 737 N.E.2d 1094 (2000). In Brandon S., the Appellate Court, First District, recently held that the denial of a section 2-28(4) motion to modify custody is not appealable under Rules 301 and 303 because such a motion "jump[s] the gun on the next scheduled permanency hearing and the order resulting therefrom could be analogized to an order resulting from a permanency hearing." Brandon S., 331 Ill.App.3d at 761, 265 Ill.Dec. 158, 771 N.E.2d 1117. We agree with the analysis of Brandon S. and hold that we lack jurisdiction under Rule 301 to review the denial of respondent's motion under section 2-28(4) of the Act.
Rule 304 governs cases in which a final order has been entered on a separate part of the controversy. Ginnell, 316 Ill. App.3d at 791, 250 Ill.Dec. 117, 737 N.E.2d 1094. Rule 304(a) provides in part that "[i]f multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both." 155 Ill.2d R. 304(a).
We are unaware of any Illinois court that has considered whether the denial of a section 2-28(4) motion is appealable under Rule 304(a). However, our supreme court has recently held that an order entered after a permanency review hearing pursuant to section 2-28(3) is interlocutory and not appealable under Rule 304(b)(1). In re Curtis B., 203 Ill.2d 53, 59-60, 271 Ill.Dec. 1, 784 N.E.2d 219 (2002). Curtis B. guides our analysis because orders resulting from a motion under section 2-28(4) are analogous to orders entered after a section 2-28(3) permanency hearing. See Brandon S., 331 Ill.App.3d at 761, 265 Ill.Dec. 158, 771 N.E.2d 1117.
A permanency goal is "`"not a final determination on the merits with regard to termination of parental rights but, rather, an intermediate procedural step taken for the protection of and best interests of the child." '" Curtis B., 203 Ill.2d. at 58, 271 Ill.Dec. 1, 784 N.E.2d 219, quoting In re D.S., 198 Ill.2d 309, 329, 261 Ill.Dec. 281, 763 N.E.2d 251, (2001), quoting In re K.H., 313 Ill.App.3d 675, 682, 246 Ill.Dec. 451, 730 N.E.2d 131 (2000). Section 2-28 provides that "all of the rights and obligations set forth in the permanency order must remain open for reexamination and possible revision until the permanency goal is achieved." Curtis B., 203 Ill.2d. at 60, 271 Ill.Dec. 1, 784 N.E.2d 219. Therefore, the supreme court decided that a permanency order entered under section 2-28(3) (705 ILCS 405/2-28(3) (West 2000)) is merely interlocutory and not final or appealable under Rule 304(b)(1). Curtis B., 203 Ill.2d. at 59-60, 271 Ill.Dec. 1, 784 N.E.2d 219. The court severed the appeal provision of section 2-28(3) after concluding that the legislature violated the doctrine of separation of powers when it attempted to make the nonfinal judgments under that section appealable. Curtis B., 203 Ill.2d. at 59-60, 271 Ill.Dec. 1, 784 N.E.2d 219.
*252 Section 2-28(3) and section 2-28(4) each provide a procedure by which the circuit court may reexamine and revise the rights and obligations set forth in a permanency order. Because an order entered after a section 2-28(3) proceeding is not appealable under Rule 304, we hold that an order disposing of a motion to modify guardianship or custody under section 2-28(4) also is interlocutory and not final and appealable under Rule 304. Cf., Curtis B., 203 Ill.2d. at 59-60, 271 Ill.Dec. 1, 784 N.E.2d 219 (holding that a permanency order entered under section 2-28(3) is interlocutory).
In this case, the trial court granted respondent's request for a written finding of finality. However, the court's Rule 304(a) finding does not render the nonfinal order appealable. See Blott, 283 Ill.App.3d at 660, 218 Ill.Dec. 848, 670 N.E.2d 345. Accordingly, we conclude that we lack jurisdiction under Rules 301 and 304(a) because the order denying respondent's motion to modify custody is not a final order.
The State contends that we lack jurisdiction to review the denial of respondent's motion to modify custody because, unlike section 2-28(3), section 2-28(4) does not expressly authorize an appeal. However, the appeal provision of section 2-28(3) of the Act is unconstitutional. Therefore, we note that, even if the legislature had included an appeal provision in section 2-28(4), it would be unconstitutional under the supreme court's separation-of-powers analysis set forth in Curtis B. See Curtis B., 203 Ill.2d. at 59-60, 271 Ill.Dec. 1, 784 N.E.2d 219.
We next consider whether Rule 306(a)(5) confers appellate jurisdiction. Rule 306(a)(5) permits an appeal when the appellant petitions for and the appellate court grants leave to appeal from an interlocutory order affecting the care and custody of unemancipated minors. 166 Ill.2d R. 306(a)(5). Rule 306 requires, as a prerequisite to invoking appellate jurisdiction, the filing of a petition "in the Appellate Court in accordance with the requirements for briefs within 30 days after the entry of the order." 166 Ill.2d R. 306(b). Respondent failed to file a petition for leave to appeal, but he contends that we must nevertheless consider the appeal under Rule 306(a)(5). We disagree in part.
In Curtis B., the supreme court rejected the respondent's argument that the appellate court must review a permanency order entered under section 2-28(3) of the Act. The court held that the appellate court may review such an order as a matter of judicial economy under Rule 306(a)(5). Curtis B., 203 Ill.2d. at 63-64, 271 Ill.Dec. 1, 784 N.E.2d 219. The appellate court had dismissed the appeal for lack of jurisdiction because the respondent's jurisdictional statement cited only the appeal provision of section 2-28(3) of the Act and Rule 304(b)(1).
The supreme court agreed that neither section 2-28(3) nor Rule 304(b)(1) conferred appellate jurisdiction. The court nevertheless reversed the appellate court's dismissal of the appeal and remanded the cause for the appellate court to consider granting leave to appeal under Rule 306(a)(5) even though the respondent had not cited the rule or filed a petition under Rule 306(b). The court held that a remand was appropriate because the respondent filed her notice of appeal before the appellate court held that the appeal provision of section 2-28(3) was unconstitutional. Curtis B., 203 Ill.2d. at 63-64, 271 Ill.Dec. 1, 784 N.E.2d 219.
The supreme court relied upon In re Marriage of Leopando, 96 Ill.2d 114, 70 Ill.Dec. 263, 449 N.E.2d 137 (1983), in excusing *253 the respondent's noncompliance with Rule 306. In Leopando, the defendant appealed a custody order in a dissolution-of-marriage case and the supreme court held that the issue was not a separate claim that could be appealed under Rule 304(a). However, the court did not dismiss the appeal because "[i]t seem[ed] clear that the law at the time of the instant appeal implied that custody orders, containing the requisite Rule 304(a) language by the trial court, were immediately appealable." Leopando, 96 Ill.2d at 117, 70 Ill.Dec. 263, 449 N.E.2d 137.
This case is procedurally distinguishable from Leopando and Curtis B. At the time respondent appealed from the dismissal of his motion to modify custody here, no case or statute suggested that such an order was final and appealable. Therefore, respondent had no reason to believe that Rules 301 and 304(a) would confer jurisdiction and that his noncompliance with Rule 306 would be excused. We do not construe Curtis B. to hold that the appellate court must alert a potential appellant of his option to file a Rule 306(b) petition for leave to appeal and then wait indefinitely for the party to file one or waive the requirement altogether. However, we may exercise our discretion and entertain jurisdiction if we deem it appropriate. See In re Marriage of Agustsson, 223 Ill. App.3d 510, 517, 165 Ill.Dec. 811, 585 N.E.2d 207 (1992) (after a timely notice of appeal was filed, the appellate court entertained jurisdiction in the interests of judicial economy although a proper Rule 306 petition was not filed).
We dismiss respondent's appeal from the denial of his motion to modify custody and guardianship because we lack jurisdiction under Rules 301 and 304(a). We refuse to entertain respondent's appeal under Rule 306(a)(5), as judicial economy will not be served. We nevertheless address respondent's substantive arguments in appeal No. 2-02-0395 in which he challenges the trial court's order transferring guardianship to the foster parents and closing the case.

APPEAL No. 2-02-0505
DCFS and respondent each appeal from the April 12, 2002, order transferring guardianship to the foster parents and closing the case. An order closing a juvenile case under section 2-31(2) of the Act is final and appealable (In re Bettie Jo R., 277 Ill.App.3d 401, 402, 213 Ill.Dec. 795, 660 N.E.2d 52 (1995)), and an appeal from a final judgment draws into issue all prior nonfinal orders that produced the final judgment (Yamada Corp. v. Yasuda Fire & Marine Insurance Co., 305 Ill.App.3d 362, 367, 238 Ill.Dec. 822, 712 N.E.2d 926 (1999)). Therefore, we have jurisdiction to consider the two appeals from the April 12, 2002, order closing the case. DCFS appeals the order in appeal No. 2-02-0505.
DCFS argues that the trial court's order was against the manifest weight of the evidence and that DCFS should have retained guardianship with the permanency goal of returning the minors to respondent's home. We agree.
The purpose of the Act is to serve the best interests of children. 705 ILCS 405/1-2(1) (West 2000). Whenever possible, everything must be done to return a child to the care and custody of a biological parent. 705 ILCS 405/1-2(1) (West 2000). Once a child is adjudicated neglected and placed in the custody of DCFS, the court must regularly conduct "permanency hearings" during the pendency of the case to determine the proper placement of the child. 705 ILCS 405/2-28(2) (West 2000); In re D.S., 198 Ill.2d 309, 326, 261 Ill.Dec. 281, 763 N.E.2d 251 (2001).
At the conclusion of a permanency hearing, a written order must be entered *254 setting forth a permanency placement goal for the child. 705 ILCS 405/2-28(3) (West 2000). The circuit court has the discretion to select a permanency goal and to render a final decision as to the placement of the child that is in his or her best interests, and the court's decision will not be disturbed unless it is against the manifest weight of the evidence. In re D.S., 317 Ill.App.3d 467, 472, 251 Ill.Dec. 224, 740 N.E.2d 54 (2000). The finding of a trial court is against the manifest weight of the evidence if a review of the record reveals that the opposite result was the proper one. D.S., 317 Ill.App.3d at 472, 251 Ill. Dec. 224, 740 N.E.2d 54.
The available permanency goals are as follows: (1) return home within five months, (2) return home within one year, (3) return home pending a status hearing, (4) substitute care pending court determination on termination of parental rights, (5) adoption after the termination of parental rights, (6) private guardianship, (7) substitute care pending independence, or (8) substitute care due to developmental disabilities or mental illness. 705 ILCS 405/2-28(2)(A) through (2)(G) (West 2000). "In selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were ruled out." 705 ILCS 405/2-28(2) (West 2000).
The factors to consider when deciding the best interests of the child are as follows: (1) the age of the child, (2) other options available for permanence, (3) the current placement of the child and the intent of the family regarding adoption, (4) the emotional, physical, and mental status or condition of the child, (5) the types of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed, (6) the availability of services currently needed and whether the services exist, and (7) the status of siblings of the minor. 705 ILCS 405/2-28(2) (West 2000). The court must also consider the permanency goal recommended by DCFS, the appropriateness of the services provided, the parties' efforts to achieve the goal, and the extent to which the goal has been achieved. 705 ILCS 405/2-28(2) (West 2000).
In November 2000, the trial court changed the permanency goal from return home within 12 months to private guardianship. The court ruled out the goal of return home for both girls after finding that respondent had not attended enough of Zayda's therapy sessions. However, the court failed to state in writing why it was ruling out the other preceding permanency goals, such as substitute care and adoption, as is required by statute. See 705 ILCS 405/2-28(2) (West 2000). In November 2001, the court again set the goal at private guardianship despite finding irregularities in DCFS's management of the case. Ortega-Piron, the DCFS guardianship administrator, acknowledged that respondent had not received adequate services and recommended that the goal remain at return home even though the minors had spent nearly all of their lives with the foster parents.
At the time DCFS took Alicia and Zayda into protective custody, respondent was the noncustodial parent. Respondent acquiesced in the neglect adjudications but immediately asserted that he desired custody. The DCFS administrator later admitted that respondent's progress with the various service plans was adversely affected by DCFS's failure to provide him with adequate services in Spanish. For example, respondent initially earned low scores on psychological and parenting evaluations because they were administered in English, but his scores improved when he was tested again in Spanish. Moreover, Hinde, the primary caseworker assigned to the *255 case from October 1997 to September 1998, did not speak Spanish.
Respondent was employed throughout the case, and his employer, who is also his aunt, allowed a flexible work schedule to accommodate respondent's visitation and participation in Zayda's therapy sessions. The trial court was most concerned with respondent's failure to participate in all of the sessions, but DCFS admitted that respondent received conflicting information about which sessions he was required to attend. Therefore, his noncompliance with that task can be at least partially attributed to DCFS.
Furthermore, the foster parents' guardianship of the girls undermined their cultural, religious, linguistic, and familial ties and therefore was not in their best interests. See 705 ILCS 405/1-3(4.05) (West 2000). Respondent and the foster family speak different languages and practice different religions. The girls spoke little Spanish despite court-ordered tutoring sessions, and the foster parents baptized the children without respondent's knowledge.
The foster parents repeatedly attempted to exclude respondent from Zayda's therapy sessions in Aurora even though he drove two hours from Wisconsin each time. The trial court addressed the problem by unreasonably barring respondent from those sessions at which he arrived more than 10 minutes late. Also, the foster mother alerted several agencies to respondent's immigrant status to hasten the minors' permanent transition into the foster home. DCFS was told that respondent had struck the girls and that they were anxious after returning from certain visits, but these accusations were proved to be unfounded. The foster parents' attempts to alienate respondent from his children are even more troubling when viewed in light of respondent's good-faith, diligent effort to regain custody.
Despite the foster parents' adversarial tactics and DCFS's frequently inappropriate administration of the case, respondent made consistent progress toward the return of Alicia and Zayda. Respondent completed the psychological evaluation, drug and alcohol testing, parenting classes, and counseling sessions as required. Respondent established a permanent residence in Wisconsin, consistently visited his daughters, and met with doctors and therapists to learn more about Zayda's condition. Moreover, respondent ended his relationship with the mother, whose conduct was the primary basis for the neglect adjudications. Thereafter, respondent developed a healthy and serious relationship with his fiancee, and they now share a son. DCFS confirmed that respondent, his fiancee, and his son interacted well with Alicia and Zayda during the girls' visits to Wisconsin.
Respondent attended several of Zayda's therapy sessions, displayed an understanding of her condition, and acknowledged that her "special needs" require continued treatment. DCFS concluded that Zayda is a "high functioning" child who should be returned to respondent after additional DCFS services are coordinated with those in Wisconsin. Even if respondent were unprepared to care for Zayda, nothing suggests that he could not provide adequate food, shelter, and clothing for Alicia, who has no special needs.
After reviewing all of the evidence, we conclude that the trial court's November 2000 and November 2001 orders setting the permanency goal to private guardianship and the April 12, 2002, order transferring guardianship to the foster parents are against the manifest weight of the evidence because a return home to respondent *256 was in the best interests of Alicia and Zayda at that time.

APPEAL No. 2-02-0395
Like DCFS, respondent appeals from the April 12, 2002, order transferring guardianship. However, unlike DCFS, respondent contends that the trial court should have granted him immediate guardianship and custody of the minors. Respondent argues that (1) he was denied his constitutional "fundamental rights/superior rights" to the children, (2) the Act required the court to award respondent guardianship and custody, (3) the trial court violated international, federal, and other state laws, and (4) the trial court's finding that a placement with the foster parents was in the minors' "best interests" is against the manifest weight of the evidence. We reject respondent's first three arguments. However, for the reasons set forth in our analysis of DCFS's appeal, we agree with respondent's fourth argument.
We initially comment on counsel's inclusion of excessive footnotes and an inadequate factual statement in respondent's opening brief. Supreme Court Rule 341(a) ordinarily limits such briefs to 75 pages and prohibits the use of footnotes to evade the page limitation (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(a), eff. October 1, 2001). We increased the page limitation to 100 pages at counsel's request. Thereafter, counsel filed a 96-page brief with more than two dozen footnotes. Because the brief would have exceeded the 100-page limit easily if counsel had included the footnotes in the text, we can conclude only that counsel was attempting to evade the generous page limit, and we ignore the footnotes. Moreover, the brief contains a 46-page statement of facts omitting certain evidence that undermines respondent's case. Rule 341(e)(6) requires an accurate statement of facts, without argument, necessary to an understanding of the case, and we admonish counsel for failing to comply with the rule.
Next we address respondent's contention that the trial court denied his "fundamental liberty interest" in Alicia and Zayda. Respondent essentially contends that the court's guardianship determination should have focused on his rights as the biological parent rather than on the best interests of the children. We disagree.
It is well settled that a parent has superior rights to the care and custody of a child, unless the child is placed elsewhere due to an adjudicated finding that the parent abused or neglected the child. In re J.J., 327 Ill.App.3d 70, 77, 260 Ill.Dec. 693, 761 N.E.2d 1249 (2001); In re S.S., 313 Ill.App.3d 121, 132, 245 Ill.Dec. 808, 728 N.E.2d 1165. If a child is made a ward of the court, the child's best interests are "superior to all other factors, including the interests of the biological parents." J.J., 327 Ill.App.3d at 77, 260 Ill.Dec. 693, 761 N.E.2d 1249. If the "best interests" standard can be attained only by placing the child in the custody of someone other than the natural parent, it is unnecessary for the court to find the natural parent unfit to care for the child. J.J., 327 Ill.App.3d at 77, 260 Ill.Dec. 693, 761 N.E.2d 1249.
Respondent cites Lulay v. Lulay, 193 Ill.2d 455, 250 Ill.Dec. 758, 739 N.E.2d 521 (2000), for the proposition that, "unless the parent has forfeited his right as the decision-maker for his child through his own abuse or neglect of the child, it is the parent, not a court, who gets to decide how to raise [the] child." In Lulay, the supreme court held unconstitutional a statute that granted grandparents visitation rights over the objection of the biological parents. Lulay, 193 Ill.2d at 463, 250 Ill.Dec. 758, 739 N.E.2d 521.
*257 Respondent asserts that the trial judge in this case had no greater right to intervene in the minors' lives than would their grandparents. However, respondent's argument ignores the trial court's adjudications of neglect and instead erroneously focuses on the judge's comments during the subsequent permanency reviews that respondent had not "neglected or abused" the minors. The judge's comments merely reflected her belief that the goal of return home was appropriate at that time. A review of the record reveals that the judge never intended to disturb the prior adjudications of neglect. We conclude that Lulay and the analogous United States Supreme Court cases that respondent cites do not apply here because none of them involve an adjudication of neglect.
In this case, respondent's rights as a biological parent must yield to the best interests of Alicia and Zayda because each child was adjudicated neglected and made a ward of the court. We recognize that both neglect adjudications were based primarily on the mother's misconduct and that respondent lacked the benefit of counsel when he consented to Alicia's adjudication. However, respondent readily admitted that he had not immunized Alicia, and the trial court decided that, because he sent money to Mexico each month, respondent was not indigent and, therefore, had no right to appointed counsel. Moreover, respondent remained romantically involved with the mother at the time of both adjudications, and at least one DCFS caseworker testified that the chaotic relationship placed Alicia and Zayda at serious risk. We conclude that the court properly adjudicated the minors neglected and that the "best interests" standard applies to the permanency goal and guardianship determinations.
We next address respondent's contention that the Act required the trial court to award respondent guardianship and immediate custody of Alicia and Zayda. In her brief, counsel for the State opines that her own experience teaching children with learning disabilities qualifies her to comment on the minors' best interests and Zayda's special needs. We strike this portion of the State's brief because it violates Rule 341(e)(7), which prohibits the introduction of evidence not contained in the record on appeal.
As previously discussed, we conclude that the trial court's decisions to set the permanency goal at private guardianship and to transfer guardianship to the foster parents are against the manifest weight of the evidence. Several DCFS representatives testified that DCFS should retain guardianship until respondent was fully prepared for Alicia and Zayda to return home. Furthermore, DCFS was working with Wisconsin agencies to coordinate services for respondent and the minors. All of the medical experts opined that Zayda required additional services to address her special needs. Therefore, it was not against the manifest weight of the evidence for the trial court to conclude implicitly that an immediate return home was not in the minors' best interests.
Finally, respondent claims that the court violated his rights under the Vienna Convention (Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77) and under federal and state law. For example, respondent asserts that DCFS's two-year delay in notifying the Mexican Consulate of the juvenile proceedings prejudiced him because the Consulate ultimately discovered evidence that supports his case. Respondent also argues that he was prejudiced by the placement of the minors with English-speaking foster parents and by the order directing him to participate in certain therapy sessions at which no interpreter was provided. However, respondent *258 does not explain how these alleged violations would entitle him to immediate custody of his children. We decline to grant respondent this relief and remand the cause without deciding the merits of these grievances.

CONCLUSION
We dismiss respondent's appeal from the denial of his motion to modify custody and guardianship. We reverse the order transferring guardianship from DCFS to the foster parents. We also remand the cause for the trial court to reopen the case, set an appropriate permanency goal for the minors, and order respondent and the foster parents to cooperate with DCFS to facilitate a transition of Alicia and Zayda into respondent's home if such a transition is still appropriate.
No. 2-01-1465, Dismissed.
Nos. 2-02-0395 and 2-02-0505, Reversed and remanded with directions.
McLAREN and BOWMAN, JJ., concur.