*In re* V.M. *et al.*, Minors, Respondents-Appellees (The People of the State of Illinois, Petitioner-Appellee, v. L.C., Respondent-Appellant).

First District (1st Division)   No. 1—01—3434

Opinion filed September 13, 2004.

[REDACTED]

Randy Crumpton, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Respondent-appellant, L.C., is the biological mother of minors V.M. (male child born in April 1995) and M.M. (female child born May 1996). The juvenile court entered an order transferring guardianship to the paternal grandparents of the minors and closing the case. L.C. seeks review of whether the trial court's permanency goals and final order were against the manifest weight of the evidence. For the reasons set forth below, we affirm.

## BACKGROUND

On October 4, 1996, the Department of Children and Family Services (DCFS) filed petitions for adjudication of wardship on behalf of the minors alleging that on or about September 3, 1996, V.M. suffered brain damage or a skull fracture and bruises on his legs as a result of a direct action of the parent or other persons responsible for the child's welfare.

During a hearing on October 7, 1996, the stipulated facts provided that V.M. sustained a skull fracture and bruises to his legs. Further, when asked how the child received the injuries, L.C. provided the DCFS worker and hospital staff three different accounts. L.C. told hospital staff that she attempted suicide on or about August 22, 1996. If called to testify, L.C. would state that she gave a consistent account of how the injury to V.M. was sustained. The father of V.M. and M.M. was not the custodial parent at the time of the incident.

On February 25, 1997, an adjudication hearing was held for V.M. and M.M. and the court found that pursuant to section 2—3 of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/2—3 (West 1996)), the minors were abused or neglected due to physical abuse and an injurious environment while in L.C.'s care.

On July 29, 1997, a dispositional hearing was held and both parents were found unable for some reason other than financial circumstances alone to care for, protect, train or discipline the minors. The court also found that reasonable efforts had been made to prevent or eliminate the need for the removal of the minors from the home and appropriate services aimed at family preservation and family reunification were unsuccessful. Therefore, the court held that it was in the best interest of the minors to take them from the custody of the parents. The minors were placed in the guardianship of DCFS, with the right to place the minor.

On April 14, 1998, L.C. was granted unsupervised overnight visits up to two nights per week. In May 1999 and November 1999, the visitation was suspended due to DCFS hot line allegations of abuse. In December 1999, L.C. filed a motion for unsupervised overnight visitation.

At the hearing on L.C.'s motion, on January 7, 2000, DCFS caseworker and child welfare specialist Robert Brown testified that he was assigned to this case for approximately two years, until another caseworker took over the case. He stated that DCFS recommended that unsupervised visits be reinstated because the recent investigation was unfounded, the family therapist recommended that visits be unsupervised, a DCFS caseworker found the visits between the mother and children appropriate based on her observation, and the mother had cooperated with services and was likely to continue to do so. He also recommended individual counseling for L.C. with a therapist other than the family therapist, resources for anger-management and behavior modification therapy, family therapy sessions with another agency, and conflict resolution with the paternal grandfather. Brown believed it was in the best interests of the children to reinstate unsupervised visits.

On January 31, 2000, family therapist Grecia Bautista, Robert Brown and L.C.'s psychiatrist, Carlos Espaillat, testified at the hearing on L.C.'s motion for unsupervised overnight visitation. DCFS worker Brown testified that he would recommend two-hour, unsupervised day visits initially and then eight-hour visits. Psychiatrist Espaillat testified that he observed a positive relationship between the children and L.C. Therapist Bautista testified that she observed L.C. change "[a] little bit" in her ability to manage her anger. She also noted that L.C. was "still interested in continuing working for her children and wishe[d] to make some changes in her life." Bautista said that despite the fact that L.C. had poor coping skills and impulse control, she believed that L.C. had the capacity to know what her situation was and knew how to collect herself, cope with the situation and

take control of it. From her meetings with L.C., she had not observed anything that would give her the impression that L.C. was going to abuse the children. She noted that L.C. had demonstrated the ability to discipline the children without using verbal or physical force. Bautista recommended two hours of unsupervised visitation.

At the close of evidence at the January 31, 2000, hearing, the court stated that it had reservations about granting unsupervised visits and noted that L.C. had "anger control issues," albeit not directed toward her children. The court observed that from time to time, L.C. had made some progress while at other times, she had not. The court denied the motion to reinstate the unsupervised overnight visits.

A permanency hearing was held on June 6, 2000. Testimony from the January hearings was incorporated with testimony from L.C. and Tim McCray. McCray works for Life Link and became involved in the case in April 2000. He stated that L.C. did not miss any of her weekly visits with her children and all of the random "urine drops" came out "clean." All of the visits were appropriate. It was his recommendation that the foster parent have guardianship of the minors due to the amount of time the minors have been in the system and the need for permanency.

L.C. testified at the June 2000 permanency hearing that she attended individual counseling until November 1999, when she and the counselor agreed that no more progress could be made. She also indicated that despite the difficulty in securing a new counselor, she was willing to participate in individual counseling. L.C. recalled that her unsupervised visitation was suspended as a result of a new report being filed against her by the caseworker based on the foster parent's assertion that a bruise was found on V.M. after a visit with L.C. The allegation was unfounded and visitation was resumed in November 1999. Then, in August 1999, another investigation was initiated based on her son's allegation that she kicked him. The allegation was unfounded, but the unsupervised visitation had not been resumed by the time of the hearing. However, she had participated in one-hour, supervised visits with her children whenever a caseworker could pick her up. L.C. testified that she loves her children, wants them back and would like unsupervised visits reinstated.

Following that June 2000 hearing, the court found that L.C. had not made "real" progress in the three years that counseling was available to her and held that the goal was private guardianship. The court indicated that the most probative factor was the series of counseling reports, which persuaded the court that, through January 2000, L.C. was consistently provided with counseling but she did not make

substantial progress. The court held that the goal of private guardian-ship was in the best interest of the children.

In July 2001, DCFS filed a motion to vacate guardianship, terminate wardship, and close the case. A petition was also filed to ap-point the minors' paternal grandparents as co-guardians.

On August 21, 2001, Shameka Williams from Life Link testified at the permanency planning hearing that the children had resided with the grandparents for approximately 4½ to 5 years and it was her opinion that the placement was appropriate. The court took judicial notice of the hearings held in January 2000 and June 2000, and the hearing on DCFS' motion to vacate guardianship. The court indicated that nothing in the proceeding changed its decision for the goal of private guardianship. The court relied on the report of L.C.'s therapist, Amy Bauer, who had been working with L.C. from June 2000 to May 2001. Notes from the closing therapy session that occurred on May 15, 2001, provided that Ms. Bauer believed that L.C. displayed behaviors and ideas which were congruent with borderline personality disorder. The report also indicated that L.C. continued to have difficulty recognizing how her behaviors impacted her relationships and how others perceive her. Bauer recommended that, given L.C.'s difficulty in understanding and changing her "cognitions and behaviors" and given the length of time for the children's current placement, the children should remain in the current foster home with a guardianship goal.

As DCFS proceeded with its motion to vacate guardianship on August 21, 2001, Shameka Williams testified that adoption had been ruled out as a permanency goal because the mother does have a bond to the children and the agency would like for her to remain in their lives. Williams did not want to terminate L.C.'s parental rights. She testified that the grandparents are aware of their responsibility to al-low monthly visitation by the natural parents. It was Williams' recom-mendation that the grandparents be named as the guardians of V.M. and M.M. On cross-examination, Williams acknowledged that the grandparents and L.C. have a strained relationship.

At the conclusion of the evidence, the State and the public guard-ian recommended that private guardianship be ordered. The father, through counsel, was in agreement with the public guardian's recom-mendation. L.C. was not in agreement with private guardianship and L.C.'s counsel noted that L.C. had a new baby and that she had demonstrated her ability to care for that child. The court held that it was in the best interests of V.M. and M.M. that the paternal grandparents act as private guardians for them. The court stated that the existence of L.C.'s new baby was not in the evidence before it and its decision was based solely on the evidence it received surrounding

the trial many years ago, the services L.C. participated in and did not make progress in, and her inability to parent the two children. The court emphasized that L.C.'s parental rights remained intact, the grandparents are the ultimate decision-makers for the children but they should consult with the parents, and the right to visit remains intact while the grandparents may determine where, when and how those visits take place.

L.C. filed a notice of appeal, seeking review of the August 21, 2001, order or judgment regarding "private guardians appointed; wardship terminated; case closed."

## ANALYSIS

### I. PERMANENCY ORDERS

■ L.C. initially contends that the trial court abused its discretion in changing the goal from return home to private guardianship after the permanency review on June 6, 2000. The State responds that there is no appellate jurisdiction to hear L.C.'s permanency goal challenges because the June 6, 2000, and August 21, 2001, permanency orders were not final orders and were not specified in the notice of appeal. The public guardian (Guardian) also contends that L.C.'s notice of appeal failed to specify that she was seeking review of the June 2000 and August 2001 permanency orders and the subsequent hearing on the motion to transfer guardianship made any challenge to the earlier permanency orders moot. Before addressing L.C.'s arguments, we must determine our jurisdiction over the matter.

L.C.'s appellate brief jurisdictional statement asserts that our jurisdiction over this appeal lies under Supreme Court Rule 301, which considers appeals from final judgments of a circuit court in a civil case as a matter of right. 155 Ill. 2d R. 301. Rule 301 governs appeals from cases in which a final order has disposed of the entire controversy. *In re M.M.*, 337 Ill. App. 3d 764, 773, 786 N.E.2d 654 (2003). However, the Illinois Supreme Court has stated that a permanency order, by statute, does not finally determine a right or status of a party. *In re Curtis B.*, 203 Ill. 2d 53, 56, 784 N.E.2d 219 (2002). By operation of section 2—28(3) of the Juvenile Act (705 ILCS 405/2—28(3) (West 2000)), all of the rights and obligations set forth in a permanency order must remain open for reexamination and possible revision until the permanency goal is achieved. *Curtis B.*, 203 Ill. 2d at 60. Permanency orders must be reviewed and reevaluated at a minimum of every six months. 705 ILCS 405/2—28(2) (West 2002). Therefore, "[n]one of the determinations contained in a permanency order can be considered set or fixed as a matter of law." *Curtis B.*, 203 Ill. 2d at 59. Accordingly, because permanency orders may not be appealed under

Rule 301, we do not have jurisdiction to review the issues regarding the permanency orders in the instant case. See *M.M.*, 337 Ill. App. 3d at 772.

Furthermore, we acquire no jurisdiction to review other judgments or parts of judgments not specified or fairly inferred from the notice of appeal. *In re J.P.*, 331 Ill. App. 3d 220, 234, 770 N.E.2d 1160 (2002). Supreme Court Rule 303(b)(2) requires that the notice of appeal "shall specify the judgment or part thereof *** appealed from and the relief sought from the reviewing court." 155 Ill. 2d R. 303(b)(2). Here, L.C.'s September 18, 2001, notice of appeal states that her appeal is taken from the August 21, 2001, order or judgment regarding "private guardians appointed; wardship terminated; case closed." Despite that designation, she urges this court to review the June 2000 and August 2001 permanency goals. Because L.C.'s notice of appeal does not specify that the appeal is taken from the court's June 2000 or August 2001 permanency order, we may not consider her claims with respect to those orders. See *In re Lakita B.*, 297 Ill. App. 3d 985, 991-92, 697 N.E.2d 830 (1998).

## II. PRIVATE GUARDIANSHIP AND CLOSING THE CASE

L.C. contends that the trial court abused its discretion in setting a private guardianship goal and ruling in favor of DCFS' motion to transfer guardianship to the foster parents and close the case, which was against the manifest weight of the evidence and in violation of section 2—31(2) of the Juvenile Act (705 ILCS 405/2—31(2) (West 2000)). While we cannot review the permanency goal, we will address the final order granting private guardianship.

The purpose of the Juvenile Court Act is to serve the best interests of the children involved. 705 ILCS 405/1—2(1) (West 2000). Whenever possible, everything must be done to return a child to the care and custody of a biological parent. 705 ILCS 405/1—2(1) (West 2000). The circuit court has the discretion to select a permanency goal and to render a final decision as to the placement of the child that is in his or her best interests, and the court's decision will not be disturbed unless it is against the manifest weight of the evidence. *In re D.S.*, 317 Ill. App. 3d 467, 472, 740 N.E.2d 54 (2000). The finding of a circuit court is against the manifest weight of the evidence if a review of the record reveals that the opposite result was the proper one. *D.S.*, 317 Ill. App. 3d at 472.

When deciding the best interests of the child, the following factors should be considered: (1) the age of the child, (2) other options available for permanence, (3) the current placement of the child and the intent of the family regarding adoption, (4) the emotional, physi-

cal, and mental status or condition of the child, (5) the types of services previously offered and whether or not the services were successful and, if not successful, the reasons the services failed, (6) the availability of services currently needed and whether the services exist, and (7) the status of siblings of the minor. 705 ILCS 405/2—28(2) (West 2000).

■ In its ruling, the circuit court here considered factors such as the current placement of the children, the intent of the foster parents, the fact that adoption had been ruled out by the foster parents and DCFS, the emotional, physical, and mental status or condition of the children, the types of services previously offered to L.C. and whether or not the services were successful and, if not successful, the reasons the services failed. The circuit court stated that its decision was based solely on the evidence it received surrounding the trial many years ago, the services L.C. participated in but did not make progress in, and her inability to parent the two children. In light of these factors, the court held that it was in the best interests of the children to appoint their grandparents as private guardians until they reached adulthood or further order of the court. The court emphasized that L.C.'s parental rights remained intact and noted that while the grandparents were the ultimate decision-makers for the children, they should consult with the parents. The court also stated that the right to visit remains intact even though the grandparents may determine where, when and how those visits take place.

The children's best interests are superior to all other factors, including the interests of the biological parents. *In re Alicia Z.*, 336 Ill. App. 3d 476, 498, 784 N.E.2d 240 (2002). While L.C. participated in the services required of her, the progress made in these sessions was not satisfactory. Additionally, the stability of the children's home environment was a primary factor for the court's ruling. We cannot say that the court, which had monitored the case for years, ruled against the manifest weight of the evidence.

For the foregoing reasons, the order of the court granting private guardianship to the minors' foster parents/grandparents and closing the case is affirmed.

Affirmed.

GORDON and McBRIDE, JJ., concur.