2024 IL App (1st) 240599
No. 1-24-0599
Opinion filed October 25, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* Kam. B., K.S., Kar. B., and Kay. B., Minors. | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 20 JA 291, 20 JA 292, 20 |
| | ) | JA 293, 20 JA 294 |
| v. | ) | |
| | ) | |
| LaTonya S. | ) | Honorable |
| | ) | Shannon P. O'Malley, |
| Respondent-Appellant). | ) | Judge, presiding. |
| | ) | |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Tailor and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Due to their mother's mental health issues, sisters Kam. B., Kar. B., K.S. and Kay. B. have been in and out of custody in the Department of Children and Family Services (DCFS) since 2017. After briefly returning home in January 2020, DCFS again took custody of the girls, all of whom have special needs. The girls were placed with a foster parent. The circuit court entered a permanency goal of private guardianship. In October 2023, DCFS moved to vacate its guardianship, terminate wardship, appoint the girls' foster parent as guardian, and close the

case. After a hearing, the circuit court granted the relief DCFS requested, finding guardianship was in the children's best interests. Their mother appeals, arguing the manifest weight of the evidence did not support the court's ruling. We disagree and affirm. Although the mother has made progress, the children's best interests support closing the case and appointing the foster parent as guardian.

¶ 2                                     Background

¶ 3        Kam. B. and Kar. B., twin girls, were born in 2011, and their sisters, K.S. was born in 2013, and Kay. B. was born in 2015, to LaTonya S. and Kevin B. (The whereabouts of the putative father, Kevin B., is unknown, and he is not a party to this appeal.) The children came into the system in 2017 due to their mother's untreated mental illness. They returned home in March 2018, but were back in the custody of the DCFS in August 2018. The girls returned to their mother in January 2020, and the case was closed. But, DCFS again took custody of the children a month later, after their mother had a mental health crisis requiring hospitalization.

¶ 4        In February 2020, the State filed petitions for adjudication of wardship and a motion for temporary custody of the four girls. The petitions alleged that DCFS took custody of the children and deemed them neglected due to an injurious environment. The petitions also alleged the girls were abused due to exposure to a substantial risk of physical injury by other than accidental means and without proper care because of their parent's physical or mental disability. Specifically, the petitions alleged that on February 11, 2020, LaTonya was acting erratically when she brought the children to school. The children were dirty and unkempt, had flu symptoms and diarrhea, and were sent home. A DCFS investigator could not locate LaTonya and the children that day. The next day, LaTonya again acted erratically when she

brought the girls to school, prompting school staff to call the police and an ambulance. LaTonya was hospitalized and diagnosed with schizoaffective disorder and schizophrenia.

¶ 5　　The circuit court found probable cause and an urgent and immediate need to remove the girls from their mother and place them in the temporary custody of the DCFS Guardianship Administrator. The court appointed guardian *ad litem* for the girls and the public guardian as their attorneys. The court also appointed the public defender to represent LaTonya and ordered LaTonya be allowed supervised visits.

¶ 6　　On September 9, 2021, the circuit court found the girls were neglected due to an injurious environment, based on stipulated facts that LaTonya was involuntarily psychiatrically hospitalized and could not care for the children, who were ill. By agreement, the court continued the case for a dispositional hearing.

¶ 7　　At the hearing, the circuit court found that LaTonya could not care for them, made the girls wards of the court, and placed them in DCFS guardianship. The court entered a permanency goal of private guardianship, finding it was in the children's best interests. The court noted that the children are in a permanent home and that although LaTonya has made efforts, reunification services had been unsuccessful due to a lack of progress. At the next permanency hearing in July 2022, the circuit court again found private guardianship was in the children's best interest "because they have been in and out of foster care three times due to mother's mental health concerns."

　　　　　　　　　　　　July 7, 2023, Permanency Hearing

¶ 9　　After several continuances, the circuit court held a permanency hearing on July 7, 2023. The State called Valencia Randolph, project manager for the assigned agency, Little City Foundation. Randolph testified that Little City received the girls' case from another agency in

2020. DCFS got involved after LaTonya struggled with mental health issues, noting she had been diagnosed with schizophrenia and bipolar disorder. Little City had not yet assigned a case worker, but a team monitored the case and completed home visits. Randolph became part of the team in April 2023.

¶ 10       The four girls were placed with Gwen S., a nonrelative specializing in children with special needs. The twins, Kam. B. and Kar. B., have lived with Gwen S. since February 2020. K.S. and Kay. B. have lived with her since October 2020. A Little City team member visits the foster home three times a month and has confirmed a safe and appropriate placement with no abuse, neglect, corporal punishment, or unusual incidents. Gwen S.'s teenage, adopted daughter also lives in the home and shares a bedroom with the four sisters.

¶ 11       Randolph briefly described the girls. Kar. B., entering seventh grade, has an Individualized Education Program (IEP) and individual therapy and was doing well in school. Her twin, Kam. B., diagnosed with autism, also receives special education and individual therapy. K.S., entering fifth grade, and Kay B., entering third grade, likewise attended individual therapy and were doing well in school.

¶ 12       Randolph was not personally in contact with LaTonya but received reports from Little City staff about three months earlier. Randolph said Gwen S. supervised LaTonya's monthly visits with the girls. The visits have been appropriate, but during the most recent visit a week earlier, LaTonya was heard telling the children to "tell the truth" that "you want to come home and live with me." Randolph said the girls had behavioral issues after this visit. LaTonya denied using those words, and the issue was resolved in mediation.

¶ 13       Randolph said LaTonya meets monthly with a psychiatrist, who monitors her medication, and attends individual therapy. Randolph recommended guardianship remain the goal because

it is safe and appropriate, given that the girls have been removed from the home several times. The agency was not recommending termination of parental rights because the children still want to see their mother. They are bonded with Gwen S. and have indicated they want to stay in her home but still want contact with their mother.

¶ 14 On cross-examination, Randolph agreed that LaTonya attends all visitations and birthdays, and brings gifts, and that the girls have told Gwen S. that they love LaTonya, sometimes asking to see her more than once a month. Randolph acknowledged that the girls were initially taken from LaTonya's custody because she was not taking her medication.

¶ 15 LaTonya testified that she was diagnosed with bipolar schizophrenic disorder in 2018 and is on Social Security disability. The children were removed from her home and returned to her in January 2020. The next month, the pharmacy refused to give her medication because their computer system listed two psychiatrists for her. She was off her medication and had an incident at the girls' school, prompting a call to the DCFS hotline and her hospitalization. Her medication issues resolved, she has cooperated with DCFS, attended all court dates and visitations, and wants the girls returned to her. Since 2020, she has been attending therapy weekly.

¶ 16 LaTonya expressed concern that caseworkers did not know that, for years, the girls have asked her about returning home. During the most recent visit, a week earlier, she told them that if questioned about where they want to live, they should say they want to live with her. The girls told Gwen S. about the conversation. LaTonya insisted that she was not trying to influence the children's decision but rather wants the girls returned to her because she loves them, they love her, and she wants to make them happy.

¶ 17    Next, Deniece Rudy, a special needs teacher and friend of LaTonya's since 2019, testified. She met LaTonya while teaching the twins in her third-grade class. Rudy did not know the other two girls, having met them once. Rudy developed a close friendship with LaTonya, mentoring her and attending church with her. When the case came into the system in 2020, LaTonya was working, and the children were in daycare, but now that LaTonya is on permanent disability, she can take care of them. Over the past few years, LaTonya has changed her life in many ways, including being "very receptive to learning." LaTonya is an excellent cook and brings nutritional meals to visit with the girls. Rudy lives near LaTonya and if the children were returned to LaTonya's care, Rudy would assist.

¶ 18    At argument, the assistant public guardian asked the court to re-enter the private guardianship goal because the children have been well settled in their foster home for a long time and have bonded with Gwen S. She asserted the children "have clearly and unequivocally expressed a desire to remain with their foster parent but to also have visitation with their mother. Even though I appreciate that [LaTonya ] has stabilized herself, the children need permanency, and they need the stability that they've developed with their foster parent."

¶ 19    The State "applaud[ed] [LaTonya] for doing what she's doing *** not just for the kids but for herself" and expressed appreciation to Rudy for "helping her because *** this is a lifelong issue and a controllable issue *** by taking medication and taking them consistently." The State argued, however, that the goal should remain private guardianship, noting that the children have been in and out of care multiple times due to LaTonya's mental health and need the stability Gwen S. provides while remaining in contact with their mother.

¶ 20    LaTonya, in response, stressed her substantial progress, especially now that she regularly takes her medication. She is bonded with the children, who love her and want to return to her

home. She participates in weekly therapy and has demonstrated readiness to care for her children. She asked that the goal be changed to return home.

¶ 21    The assistant public guardian countered that although LaTonya had made "some significant and positive improvements in her life," the focus is on what is best for the girls and not their mother. Further, the night before, she had spoken to "all four children, individually, separate from each other, and from the foster parent, and each of them confirmed for me that they are happy where they are; they are well-settled; they'd love to see their mom; they love their mother dearly, but they understand that this is the place where they are safest and where they want to remain." She asked the court to honor the girls' wishes and allow guardianship to remain the goal.

¶ 22    After argument, the circuit court ruled that changing the goal to return home within 12 months was in the children's best interest. The assistant public guardian and the State asked the court to reconsider, asserting that the girls do not want to return home and changing the goal would cause upheaval. After hearing from LaTonya's attorney, the circuit court agreed to reopen the permanency hearing for testimony from the children's therapists. The court continued the permanency hearing and reserved the permanency goal.

¶ 23                    October 17, 2023, Permanency Hearing

¶ 24    Before the permanency hearing, DCFS filed separate motions asking to vacate DCFS guardianship, terminate wardship, appoint a private guardian, and close the cases. The court consolidated the motions into the permanency hearing. (Also, LaTonya moved to appoint Court Appointed Special Advocates (CASA), asserting that the court should independently assess the girls' wishes rather than rely on the opinion of the assistant public guardian. After argument, the court found that CASA was inappropriate at the present stage and continued the

motion until after the children's therapists testified. The court never ruled on the motion, nor did LaTonya request a ruling.)

¶ 25    The court heard from the children's therapists—Jessica Ruiter, M.A., and Paris Hearon, MSW, LSW. Ruiter saw Kar. B. and K.S. beginning in March 2022 and meets with them separately for an hour each week. Kar. B. was then 12 years old and had been diagnosed with adjustment disorder, anxiety, and a mild intellectual disability. Kar. B. recently started at a new school and is doing well there. She is working through her stress issues in therapy. Because of her intellectual disability and memory issues, instructions need to be in simple tasks, and she needs to be checked on often to make sure she is completing them. She also needs reminders about daily routine tasks like brushing her teeth. Kar. B. can dress herself but requires assistance with grooming and meal preparation. Kar. B. has an IEP and receives occupational therapy (OT), speech therapy, and social work services for emotional issues.

¶ 26    K.S. has ADHD, hyperactivity type, for which she takes medication. She also has expressive receptive language disorder, making it difficult for her to process language and convey herself verbally. According to Ruiter's report, K.S. also was diagnosed with adjustment disorder with mixed anxiety and depressed mood. K.S. has an IEP and gets OT and speech therapy. A social worker also works with her on her ADHD symptoms.

¶ 27    Ruiter said the girls have a bond with LaTonya and look forward to her visits. They enjoyed a recent visit to a restaurant and spend time cooking with her. K.S. said she wanted to become a chef to be like her mother. The girls frequently ask to communicate with LaTonya outside the monthly visits, and Gwen S. accommodates phone calls and texts. The girls know they will live with Gwen S. until 18 years old and have mixed feelings, stating that they would like to see their mother more often. Ruiter believes the girls would want to live with LaTonya if she

got better and could meet their needs, but they understand that her mental health makes her unstable and unable to care for them daily.

¶ 28    Ruiter said the girls refer to Gwen S. and LaTonya as "Mom." K.S. has an affectionate relationship with Gwen S. Kar. B's relationship is less affectionate, which Ruiter said was likely due to her almost being a teenager when hugging is not "cool." Gwen S. meets their special needs, including close monitoring of K.S. Handling both girls at the same time requires extensive parenting skills. Kar. B. and K.S. are "as thick as thieves" and often rely on each other when they need something, but they also go to Gwen S.

¶ 29    In describing the living conditions, Ruiter said the foster home is a three-bedroom apartment. The four sisters stay in one room with Gwen S.'s adopted daughter. Another room is an entertainment space. Gwen S. has her own room. The girls have told her they would like more space, and Gwen S. applied for a bigger unit, but it was denied and she is looking elsewhere. K.S. once told Ruiter she wanted to live with her "real mom" after she got in trouble for leaving beads on the floor, causing Gwen S. to fall. Ruiter thought she was reacting to being disciplined. Ruiter said Kar. B. has not talked about wanting to live with LaTonya. Ruiter believes the girls are happy in the home and that their social and emotional development are supported. Due to their special needs, Kar. B. and K.S. require a caretaker with a lot of resilience.

¶ 30    Paris Hearon from Little City has been the therapist for Kam. B. and Kay. B. since March 2022. Hearon testified that Kam. B., who was then 12 years old, had been diagnosed with autism spectrum disorder, moderate intellectual disability, and unspecified trauma and stress-related disorder. When Kam. B. is overstimulated she may engage in slapping and rocking behaviors and become introverted. The autism affects how she acts in school, her ability to

learn, her social skills, and how she interacts with people. She has an IEP with accommodations and is in a special education classroom, getting one-on-one assistance. Kam. B. spends a lot of time by herself, which could be a symptom of her autism or trauma history. She needs a routine and reminders about her hygiene, which Gwen S. provides. Her unspecified trauma disorder manifests in her being overly anxious and having outbursts.

¶ 31 Hearon said Kam. B. loves her mother and has bonded with her. She enjoys their visits and wants more. She says her mom is a good cook and brings her things for her birthday. Hearon observed Kam. B.'s interactions with Gwen S. but not with LaTonya. Kam. B. respects Gwen S., follows her directions, and sees her as a maternal figure and caregiver. Hearon has observed positive interaction between them. They hug and are comfortable with each other. When asked where she would like to live, Kam. B. responded with Gwen S. She said she feels safe there. Kam B. did not tell Hearon that she wanted to return to LaTonya.

¶ 32 Kay. B., who was eight years old, has been diagnosed with diminished social engagement and mild intellectual disability. A person with social engagement disorder may be overly affectionate or friendly with strangers and not recognize appropriate boundaries. Kay. B. loves LaTonya and enjoys laughing with her and hugging her. She told Hearon she wants to live with Gwen S. but also wants to see LaTonya more often and have her involved in her life. Hearon said LaTonya's mental health crises contributed to some of the trauma the girls have experienced, including attachment difficulties.

¶ 33 Kam. B. and Kay. B. would benefit from a larger bedroom, but sharing did not negatively impact their mental or physical health, and Hearon believed the girls had adequate space.

¶ 34 The court continued the permanency hearing until March 1, 2024.

¶ 35 March 1, 2024, Permanency Hearing

¶ 36    Gwen S. and LaTonya's therapist, Marissa Rohan, testified on March 1, 2024.

¶ 37    Gwen S. testified that the girls came to live with her in 2020. She briefly described each child, saying Kam. B., who has autism, seemed nonverbal when she arrived at her home, but her speech has improved, and she recently came in second place in a spelling bee. Kam B. loves to draw and is helpful. She attends weekly therapy, receives speech therapy at school, and has other assistance for her special needs. Her twin, Kar. B., is quiet, but becoming more social as she gets older. She likes to play with her sisters and friends. Kay. B. initially had behavior problems but has improved. She's smart, speaks well, and gets along with others. K.S. has some behavioral problems due to her ADHD and has trouble learning but has been able to address those issues and get back to task. She gets along well with her sisters and friends.

¶ 38    All four girls have IEPs, and Gwen S. regularly attends their IEP meeting, which are held at least once a year. She is also in contact with, and receives updates from, the girls' teachers and therapists. She has sent the information about the IEP meetings to LaTonya, but LaTonya has not attended any meetings.

¶ 39    Gwen S. supervises the girls' monthly meetings with their mother. Visitation has been in person or over Zoom; LaTonya has attended all of them. LaTonya has bonded with the girls and brings them birthday and Christmas gifts. Outside of visitation, the girls try to call LaTonya at least twice a month. LaTonya often does not answer, but she sometimes returns their messages.

¶ 40    Gwen S. said she loves the girls, wants them to live with her, and wants to become their legal guardian. She wants the girls to visit and communicate with their mother and have a

relationship with her. She knows the girls' special needs and services and believes remaining in her home would be best for them.

¶ 41    Marissa Rohan, LaTonya's therapist, submitted a letter the circuit court entered into evidence, stating that LaTonya has been receiving mental health treatment at the Sertoma Centre, Inc., since 2017 and has been in weekly therapy with Rohan since February 2020. LaTonya also meets about twice a month with her case manager, who has provided her with resources in her community. The letter detailed LaTonya's mental health diagnosis and history of symptoms, which are managed through psychotropic medication. LaTonya has been proactive in obtaining refills and taking her medication. LaTonya has demonstrated substantial progress toward her treatment goals of exploring triggers, reducing stressors, processing thoughts and emotions, and incorporating skills to manage symptoms and avoid hospitalization. In addition to therapy, LaTonya saw a psychiatrist through Sertoma until 2023, when she retained her own psychiatrist.

¶ 42    Rohan said she has reduced her weekly therapy sessions with LaTonya to every two weeks because of LaTonya's progress. Rohan noted that LaTonya has a diagnosis of schizophrenia, including delusions and hallucinations, and that back in February 2020, when the girls returned to the system, LaTonya was unmedicated and experiencing symptoms. Over time, LaTonya has become open to talking about her symptoms and illness and is now consistent with her medication. LaTonya has a support system through her church and community and works with a family resource specialist, who provides financial assistance and helps with doctors' appointments. And she has accessed other community resources, such as food pantries.

¶ 43    Rohan said LaTonya has been able to manage her mental health, so they are working on reducing her services, though the agency will always be available to her if she needs it.

LaTonya's therapeutic goals focus on processing her emotions, gaining insight into her mental health, understanding warning signs, and developing coping skills. She acknowledged that LaTonya's therapeutic goals are focused on her own mental health and not on her daughters. LaTonya is aware of her daughters' special needs and talks about them in therapy.

¶ 44        After hearing argument, the court found that a permanency goal of guardianship was in the children's best interest. The court noted that the children have lived with Gwen S. for seven years and have a stable home. The children have been in and out of the system and changing the goal to return home could lead to more instability, whereas with guardianship, "we're really not taking any chances." The court said that the children have been in the system for seven years and that although LaTonya is progressing, she still needs treatment. So, "guardianship would be the best of both worlds" because LaTonya has a relationship with Gwen S. and can continue to be involved in the girls' lives.

¶ 45        The circuit court then heard DCFS's motion for private guardianship and to close the case. Valencia Randolph, from Little City, testified that the girls' placement was safe and appropriate without signs of abuse, neglect, or unusual incidents. She said the girls could continue services if the court closed their case. Randolph said the girls' best interest would be served by having Gwen S. as their guardian.

¶ 46        Gwen S. testified that she understood that, as guardian, she would be responsible for the girls' care, custody, and control, including medical, educational, financial, and legal needs until they turn 18. She also understood she could not change the conditions of custody and must provide LaTonya with reasonable visitation, which is a minimum of one visit monthly.

¶ 47        Based on a preponderance of the evidence, the circuit court found the children's best interests was in appointing Gwen S. their guardian. The court entered an order vacating the

guardianship of the DCFS guardianship administrator, terminating wardship, establishing guardianship in Gwen S., and closing the case.

¶ 48                                                    Analysis

¶ 49                                            Standard of Review

¶ 50        To close the case and place the children in private guardianship, the circuit court had to find, by a preponderance of the evidence, that this result was in the children's best interest. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). That finding will not be disturbed unless it is against the manifest weight of the evidence. *In re V.M.*, 352 Ill. App. 3d 391, 397 (2004). Against the manifest weight of the evidence requires either a clearly apparent opposite conclusion or a determination that the court's findings were unreasonable, arbitrary, and not based on the evidence. *In re Tasha L.-I.*, 383 Ill. App. 3d 45, 52 (2008). A strong presumption in child custody cases favors circuit court decisions. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20; *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 28.

¶ 51        LaTonya contends the circuit court's best interest finding was against the manifest weight of the evidence and asks us to vacate the order and remand with instructions to enter a permanency goal of return home in 12 or 5 months.

¶ 52        The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) defines a "best interest" determination as including consideration of:

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:

- 14 -

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 53    Another factor recognized as significant is the bond a child forms with the foster parent, especially over time. See *Tajannah O.*, 2014 IL App (1st) 133119, ¶¶ 19-29; *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 37-39. In some cases, the willingness of the foster parent to maintain contact between the child and their biological parents is significant as well. See *Angela D.*, 2012 IL App (1st) 112887, ¶ 41. The circuit court need not explicitly mention each best interest factor in its decision. *In re Deandre D.*, 405 Ill. App. 3d 945, 954 (2010).

¶ 54    The circuit court prioritized the girls' needs for permanency and stability, noting that they faced upheaval and that guardianship would prevent that from happening again while still allowing contact with LaTonya. The evidence supports this finding.

¶ 55    The girls' time in LaTonya's care has been marked by instability due to her psychiatric episodes. Over seven years, they were removed from her care three times, with each removal linked to their mother's mental health struggles. For the last four years, they have resided with Gwen S., with whom they have developed a strong bond and who has provided stability and the care they require. Indeed, in her brief, even LaTonya acknowledges the importance of providing the girls with the permanence and stability that comes with appointing Gwen S. as guardian.

¶ 56    Gwen S. has shown a willingness to maintain the girls' connection with LaTonya, allowing phone calls and texts between them, and has a separate phone for this purpose. Gwen S. expressed her commitment to ensuring the girls continue visits with their mother and maintain a relationship with her. The circuit court found that guardianship strikes a balance ("the best of both worlds") between the girls' need for stability and having their mother in their lives, an appropriate factor for the court to consider. See *Angela D.*, 2012 IL App (1st) 112887, ¶ 41. This weighs in favor of the court's decision.

¶ 57    LaTonya asserts that the court overlooked other factors in focusing on permanency and stability. She noted that she consistently provides healthy, home-cooked meals during visits and that the girls enjoy cooking with her, which shows she can provide for their safety and welfare. She argues that now that she is on her medication, she should be able to care for the girls again.

¶ 58    We commend these efforts and LaTonya's progress with her mental health. We also acknowledge the hard work she has put in. Yet, the evidence does not support her assertion that she can care for four girls with significant special needs. And LaTonya's therapist testified about LaTonya's progress in dealing with her mental health issues, not about her ability to parent. The therapist acknowledged that LaTonya's therapy goals are focused on her own mental health, rather than the complex responsibilities of parenting children with special needs.

¶ 59    While LaTonya has attended all scheduled visits and the girls enjoy their time with her, she has had only supervised visits. No evidence demonstrates that LaTonya can parent on her own. As to educational needs, Gwen S. testified that she gave LaTonya information about the girls' IEP meetings, but LaTonya has yet to attend a meeting. As to health and development matters, Gwen S. has actively provided the structure and support the girls require. The evidence does not support a finding that LaTonya can do that and address her mental health.

¶ 60    LaTonya also highlighted that her home has more space, which could better meet the girls' physical needs. While space is important, the evidence shows that the girls are thriving in their current environment, where their emotional and developmental needs are being met. Space is not equivalent to well-being. Indeed, the girls' therapist testified they had adequate space in the foster home and that sharing a room did not negatively impact their mental or physical health. Moreover, Gwen S. said she hopes to find a larger apartment.

¶ 61    According to LaTonya, a child's identity and background, including religious and familial ties, are generally stronger with a mother than with a nonrelative foster parent. Although not much evidence was offered, LaTonya has a strong relationship with her church, which the children could be a part of. The State counters that LaTonya's strong connections to her church

had created problems, such as when she had hallucinations of God telling her to do things like bring her sick children to school. In the absence of additional evidence, this factor is neutral.

¶ 62    LaTonya acknowledges, and the evidence confirms, that both she and Gwen S. can meet the girls' need for a sense of attachment. The testimony attests to the girls' love for LaTonya and Gwen S., both of whom they call "mom." Further, Gwen S. has committed to supporting the girls' monthly meetings with LaTonya and weekly calls and texts.

¶ 63    As for the girls' wishes and long-term goals, the testimony suggests the girls feel most secure with Gwen S. and want to continue visits with LaTonya. Randolph testified the girls "wish to remain in the foster home as long as they could see their mother." Twelve-year-old Kam. B. told her therapist several times that she wanted to live with Gwen S. and did not say she wanted to return to LaTonya's home. Nine-year-old Kay. B. also told her therapist she wanted to live with Gwen S. The therapist for 12-year-old Kar. B. and 11-year-old K.S. testified she believes the girls would want to live with LaTonya if she got better and could meet their daily needs, but they understand that her mental health makes her unstable and unable to care for them. As the circuit court acknowledged, the girls love LaTonya and want to spend more time with her. That said, the record does not support a finding that they want to live with her or that she could provide the support, stability, and security they need.

¶ 64    LaTonya expressed frustration that she completed almost all services and was finishing the one remaining service, therapy, but the circuit court never set a goal of reunification. LaTonya asserts that when a parent has shown he or she is capable of safely and effectively caring for his or her children, they must be given that opportunity by setting the goal of return home. For support, LaTonya cites cases where this court affirmed closure to guardianship after a parent had not made progress in services or refused treatment for a mental health issue. See, *e.g.*,

*V.M.*, 352 Ill. App. 3d at 398 (affirming order closing case to guardianship where mother made little to no progress in services); *In re Faith B*., 359 Ill. App. 3d 571, 574 (2005) (mother refused mental health treatment). LaTonya cites no cases, and we found none, holding that a court must set a goal of return home when a parent has made progress in services, though other factors favor guardianship.

¶ 65    The circuit court acknowledged LaTonya's progress since 2020, correctly focused on the children's best interest and their history of being in and out of care, and found that guardianship would provide permanence, stability, and the sense of security the children need, while allowing them to maintain a relationship with the biological mother.

¶ 66    After considering the evidence and testimony, the circuit court concluded it was in the children's best interest to close the case and appoint their foster parent as guardian. That finding is not against the manifest weight of the evidence.

¶ 67    Affirmed.

*In re Kam. B.*, 2024 IL App (1st) 240599

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20-JA-291 through 20-JA-294; the Hon. Shannon P. O'Malley, Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Alex Stein, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), for other appellees. |