NOTICE

Decision filed 11/06/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250493-U

NO. 5-25-0493

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* AIDAN H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-23 |
| | ) | |
| Justin H., | ) | Honorable |
| | ) | Brett N. Olmstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice McHaney and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court had authority to extend the minor's uncle's guardianship after termination of wardship. The finding that the minor's best interest would be served by terminating wardship and appointing his uncle as his guardian was not against the manifest weight of the evidence. The respondent father forfeited any argument that the circuit court erred in holding permanency hearings in his absence.

¶ 2    Aidan H. (born February 2008) was adjudicated a dependent minor and made a ward of the court after being released from juvenile detention into the custody of his uncle, Brian M. Aidan's mother died before these proceedings began, and his father, respondent Justin H. (Father), was in custody in Indiana awaiting trial throughout the proceedings. Father appeals an order of the circuit court terminating the wardship and awarding Brian custody and guardianship of Aidan. The circuit court appointed attorney John B. Hensley to represent Father on appeal. Hensley has filed with

1

this court a motion to supplement the record on appeal and a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967). In his motion to withdraw as counsel, Hensley argues that there are no arguably meritorious claims he can raise on Father's behalf. Specifically, he contends that (1) the circuit court had authority to extend the guardianship beyond the wardship, (2) the evidence supported the circuit court's decision, and (3) Father forfeited any argument that the circuit court violated his rights by holding three permanency review hearings in his absence. This court allowed Father until September 29, 2025, to file a *pro se* brief in response to Hensley's motion to withdraw, but he has not done so. Upon review, we grant Hensley's motions to supplement the record and to withdraw as counsel, and we affirm the order of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4      In November 2022, the State filed a petition for adjudication of delinquency against Aidan. On December 31, 2022, Aidan, then 14 years old, was picked up by police and held in the Champaign County Juvenile Detention Center. The matter came to the attention of the Department of Children and Family Services (DCFS) on January 2, 2023, and a DCFS investigator met with Aidan that day at the Juvenile Detention Center. Aidan was released to the custody of his uncle, Brian M., after a detention hearing on January 3, 2023. Father did not attend the hearing.

¶ 5      On January 30, 2023, the State filed a petition for adjudication of abuse, neglect, or dependency. Count I alleged that Aidan was a dependent minor because he was under 18 years of age and did not have a parent, guardian, or legal custodian. 705 ILCS 405/2-4(1)(a) (West 2020). Count II alleged that he was neglected because Father abandoned him without a proper plan of care. 705 ILCS 405/2-3(1)(a) (West 2020).

¶ 6      The shelter care report filed the same day indicated that Father and his wife, Samantha H., were reported to have a history of drug addiction and that their parental rights to their other children

2

had been terminated in 2016. The report further indicated that in mid-October 2022 Father dropped Aidan off at the home of his paternal grandparents for a few days but did not return to pick him up. In early November 2022 Aidan and a relative went to Father's house to retrieve Aidan's belongings, and Father reportedly told Aidan he did not want to see him again. The report further indicated that there were allegations that Father choked Samantha with a seatbelt and bit off the tip of her finger late in January 2023.

¶ 7    The circuit court held an adjudicatory hearing on April 3, 2023. Brian testified that he was Aidan's maternal uncle and that he had been involved in Aidan's life since Aidan was born. Brian stated that before the events at issue took place, Aidan had lived with him "numerous times on and off throughout his life."

¶ 8    At the time of the hearing, Aidan had been living with Brian since January 3, 2023. Brian explained that, prior to that time, Aidan had been incarcerated at the Champaign County Juvenile Detention Center. Brian learned of Aidan's detention from Aidan's paternal aunt, Amanda A. She asked Brian to attend a hearing in Aidan's juvenile detention case (case No. 22-JD-149) because she did not believe Father would attend the hearing.[1] Brian attended the hearing, and the judge released Aidan into his custody.

¶ 9    Brian next testified that Aidan told him that he had been living with his paternal aunt since August or September of 2022. Aidan further told Brian that Father initially dropped him off at his paternal grandparents' house and then "disappeared and didn't come back." Shortly thereafter, Aidan began living with Amanda. Brian did not know what conversations Father had with his parents concerning Aidan's care.

---

[1]The detention report in case No. 22-JD-149 indicates that when detention center staff called Amanda on the morning of January 3, 2023, and notified her that the detention hearing would be held that day, she indicated that she was unable to attend due to work. Ten minutes later, Brian called the detention center to inform staff that he would attend the hearing.

¶ 10    Brian testified that he attempted to contact Father by phone and text message but was unable to reach him. He noted, however, that he and Amanda had been in touch since Aidan began living with him. He further noted that Aidan had a younger brother who lived with Amanda.[2]

¶ 11    At the State's request, the circuit court took judicial notice of the petition for adjudication of delinquency filed in Champaign County case No. 22-JD-149 on November 3, 2022, and the detention report filed in that case on January 3, 2023. The petition charged Aidan with unauthorized video recording (720 ILCS 5/26-4(a) (West 2020)), alleging that he knowingly made a video recording of another person in a restroom without that person's consent. The detention report indicated that when informed of Aidan's detention on January 1, 2023, Father made an appointment to visit him later that evening but did not show up. The report noted that detention center staff attempted to arrange a phone call between Aidan and Father, but when they called, there was no answer, and the voicemail was full. The report then detailed additional efforts to contact Father. It noted that staff attempted to call him on the morning of January 3, but there was no answer, and they were unable to leave a message because the mailbox was full. Staff drove to Father's house, but it was boarded up and appeared to be abandoned. A staff member called Amanda, who confirmed that Father's house was boarded up, but stated that it was not abandoned.

¶ 12    Father testified at the adjudicatory hearing that the last time Aidan lived with him was in the fall of 2022. In explaining how Aidan came to live with Amanda, Father first noted that Aidan did not get along with Samantha. He explained that "it was not good for Aidan." Father testified, "So, I asked him where he wanted to go." Father did not specify whose idea it was for Aidan to leave, and he was not asked to clarify this point. He testified that initially, Aidan indicated he

---

[2]Father and Samantha's parental rights to their son, Landon H. (born February 2010), were terminated in 2016.

4

wanted to live with his maternal grandmother in Maryland. However, after Father made arrangements for him to do so, Aidan changed his mind. He decided he wanted to live with Father's sister instead. This conversation took place in October 2022 while Father and Aidan were both staying with Father's parents to keep Aidan away from Samantha. Father testified that he wanted Aidan to live with his grandparents in Maryland because he was "concerned with the friends he was running around with here in—in Champaign-Urbana." However, Father agreed to allow Aidan to live with Amanda because he "tried to respect his decision." Father also noted that Amanda had been homeschooling Aidan and caring for his younger brother. He stated that he visited Aidan at Amanda's house and kept in touch with Amanda concerning Aidan's care.

¶ 13    The circuit court found that the State failed to prove its allegation that Father had neglected Aidan by abandoning him. The court explained that Father had a plan for Aidan's care—he planned for Aidan to stay with his aunt. However, the circuit court found that the State proved its allegation that Aidan was a dependent minor, stating that as of January 30, 2023, "there was no parent stepping forward in some way for Aidan to have a safe, appropriate home." The circuit court entered an adjudicatory order that day, finding Aidan to be a dependent minor.

¶ 14    A dispositional report was filed with the court on April 27, 2023. The report indicated that Father became Aidan's primary caregiver in August 2018 after the death of his mother. The report further indicated that Father and his wife, Samantha, each had a history of substance abuse. There was also a history of domestic abuse by both Father and Samantha. The report noted that during a January 23, 2023, argument, Father strangled Samantha with a seat belt until she started to "black out," struck her, and bit off the tip of her finger. Father was charged with attempted murder, aggravated domestic battery, unlawful restraint, and unlawful possession or use of a weapon by a felon in connection with the incident. The report noted that according to a newspaper article, Father

5

fled from police and led them on a chase into Indiana, where he opened fire on police, stole a farm truck, and attempted to run over one of the officers who returned fire.

¶ 15    The dispositional report included information gleaned from an interview with Aidan. It indicated that Aidan was in ninth grade. Although he did well in school, earning mostly As and Bs, he struggled with math. Aidan acknowledged being suspended "numerous times" for fighting when he was in middle school. He further acknowledged being suspended for two weeks and criminally charged over the incident involving a video recording of another student in the restroom. He told the interviewers that Father did not allow him to return to school after the incident. Aidan described Father's behavior while using methamphetamine during the last year he was in Father's care. He noted that Father never disciplined Aidan during this time because he "didn't care what [Aidan] did." Aidan also told the interviewers that when using methamphetamine, Father became paranoid and aggressive, accusing Aidan and Samantha of planning to kill him and engaging in physical altercations with Aidan.

¶ 16    The matter came for a dispositional hearing on May 1, 2023. The only witness to testify was Lisa Gay, Aidan's caseworker from the Center for Youth and Family Solutions, who prepared the dispositional report. Gay testified that she visited Brian's home and had no concerns about the home itself or about Brian's ability to care for Aidan.

¶ 17    The circuit court next heard the arguments of counsel. The State urged the court to award custody and guardianship of Aidan to Brian and "vacate the remainder of the case." The Assistant State's Attorney noted that placement with Father was not an option due to the serious charges pending against him in both Illinois and Indiana. She then argued, "Frankly, I do not believe [DCFS] needs to be involved in Aidan's life. There is nothing that needs to be done that is not being done by those that are providing a home at this point ***."

6

¶ 18　Father's attorney acknowledged that Father was currently unable to care for Aidan due to Father's incarceration. She also indicated that Father did not raise any concerns about the appropriateness of Brian's home. She asked the court to keep the case open, however. She argued, "I think it's appropriate for custody and guardianship to remain with the—with the responsible party. But I would ask that a wardship open, if only to give Mr. [H.] some time to sort out his legal situation and become fit."

¶ 19　The guardian *ad litem* for Aidan and the attorney representing Brian each agreed with the recommendation of the State. The circuit court questioned whether this was a feasible disposition, explaining as follows:

> "If I award custody and guardianship to [Brian], I don't—I don't know that that survives the termination of a wardship, see? So I think what happens is *** it ought to be a goal of guardianship, so there would be an actual order of guardianship outside the context of a JA case wardship. And then once that guardianship is established, goal accomplished, wardship can be terminated."

The State's attorney argued that it was not necessary to file a separate guardianship petition, noting that she believed the circuit court had "the authority to decide who has custody and guardianship, and close the case." However, she indicated a willingness to "turn it into a guardianship" if the circuit court wanted to do so. Brian's attorney likewise indicated that he was not opposed to "the wardship lasting longer with a goal of long-term guardianship."

¶ 20　In explaining its ruling from the bench, the circuit court found that Father was unable to exercise custody due to his incarceration and that Aidan was currently living with his uncle in "a very good situation for him." The court then explained:

"There's no reason for DCFS to be involved with guardianship or custody. But the way I read the—the Juvenile Court Act and how it applies to this kind of case, the award of custody and guardianship that the court can make within the Juvenile Court Act for this case lasts only as long as the wardship."

The circuit court went on to explain that once a private guardianship was established, there would be no further reason for court involvement. The court found that it would be in Aidan's and the public's best interests for Aidan to be made a ward of the court. The court entered a dispositional order to that effect the same day.

¶ 21    Father appealed the dispositional order. However, this court subsequently dismissed that appeal pursuant to Father's motion.

¶ 22    The circuit court held a permanency review hearing on October 24, 2023. Father was present for the hearing via the Zoom video-conferencing platform. The permanency goal was private guardianship. The next permanency review hearing took place on February 20, 2024. Father was again present via Zoom. The goal remained private guardianship.

¶ 23    The next permanency hearing took place on July 8, 2024. This time, Father did not personally appear, either in person or by video, but his counsel appeared on Father's behalf. The goal remained private guardianship. The circuit court held additional permanency hearings on December 10, 2024, and March 12, 2025. Father did not personally appear at either hearing. The permanency goal remained private guardianship.

¶ 24    The next permanency hearing was set for May 21, 2025. Father again appeared only through counsel. The circuit court continued the matter until June 11, 2025, and directed counsel to prepare a writ for Father's appearance.

¶ 25    On June 11, 2025, Father appeared for the rescheduled permanency hearing by Zoom. The circuit court informed the parties that it would "take up the issue of potential case closure." Through counsel, Father objected to closing the case.

¶ 26    The sole witness to testify at the permanency hearing was Brian. In response to questions from the circuit court, Brian testified that Aidan was then 17 years old and would be entering his senior year of high school. At the time of the hearing, Aidan had lived with Brian for two and a half years. Asked to describe "how things have been going," Brian replied, "Aidan is flourishing. He's doing great despite the circumstances." Brian testified that Aidan was active in school clubs and sports and had been elected homecoming king. He also did well in school, maintaining a 3.75 grade point average. Brian noted that Aidan planned to join the Marines after graduation.

¶ 27    Brian acknowledged that he had a felony conviction resulting from a bad check he wrote 20 years earlier when he was 23 years old. He explained that at the time, he worked for his uncle and believed his uncle owed him money. He took one of his uncle's checks and wrote it out to the bank. He testified that he admitted to his uncle the next day that he had written the check.

¶ 28    Brian opined that his experience of having no relationship with his own father and going through "a rough time" in his early twenties "helped [him] a lot with [his] nephew." He testified that he did not interfere with any communication between Aidan and Father and that he never said anything bad about Father to Aidan.

¶ 29    The State, the guardian *ad litem*, and Brian all argued that the circuit court should close the case and grant guardianship to Brian. Father objected. His attorney explained, "He maintains that he has parental rights. He has a right to have a say in how Aidan is raised. He objects to Aidan's involvement with the military, and that would be the basis for his request to keep the case open."

¶ 30 In announcing its ruling from the bench, the circuit court explained that the primary concern was "what the situation is right now for Aidan." The court noted that Aidan would turn 18 in less than a year. The court further noted that Father was awaiting trial on "very serious charges in Indiana" and that he was already serving a sentence in the Champaign County case.[3] Under these circumstances, it would be impossible to return custody of Aidan to Father before Aidan turned 18. The court found that Aidan had been "doing remarkably well" in his uncle's home. Based on these factors, the court found that Brian should be Aidan's legal guardian and that there would be no purpose and no benefit to Aidan in leaving the wardship in place.

¶ 31 The circuit court next stated that it had considered all of the statutory best interest factors and briefly addressed each factor. The court stated, "Aidan is physically safe and doing wonderfully." Regarding the development of his identity, the court noted that Aidan was placed with a relative. The circuit court next noted that Aidan's familial, cultural, and religious ties were "being maintained" in Brian's home. Addressing the child's sense of attachment, the court reiterated that Aidan was doing well where he was.

¶ 32 In addressing the child's wishes and long-term goals, the circuit court noted that Aidan wanted to stay where he was. The court recognized that one of Aidan's long-term goals, specifically his plan to join the Marines, differed from Father's goals for him. The court noted that disagreements between parents and their 17-year-old children are not unusual and opined that continuing the wardship would not resolve their differences.

¶ 33 The circuit court noted that Aidan's ties to his community were formed in Brian's home and would continue whether or not the wardship remained open. Addressing the need for

---

[3]In April 2025, Father was sentenced to six years in prison for aggravated domestic battery in Champaign County case No. 23-CF-155.

permanence, the court stated that Aidan was in the home where he would turn 18. The circuit court stated that it had considered the unique circumstances of this family. Noting that it must consider the risks involved with entering substitute care, the circuit court stated, "He's not in substitute care. He's living in the home that he's known for a couple of years ***." Finally, the circuit court noted that it must consider the preferences of people available to care for the child. At this point, the court emphasized that it was not terminating Father's parental rights.

¶ 34    The court entered a written order that day awarding custody and guardianship of Aidan to Brian, vacating the wardship, and closing the case. The order expressly stated that the guardianship would continue "past the date of this order." This timely appeal followed.

¶ 35                                    II. ANALYSIS

¶ 36    Appointed counsel, Hensley, has filed a motion to supplement the record on appeal and a motion to withdraw as counsel. In his motion to supplement the record, Hensley asks to supplement the record with the petition for adjudication of delinquency and the detention report from the proceedings in case No. 22-JD-149. As discussed previously, the circuit court took judicial notice of those documents. Although it is not clear to what extent the circuit court relied on the information in these documents in reaching its decisions, we find the information useful for context. We grant Hensley's motion to supplement the record.

¶ 37    In his motion to withdraw as counsel, Hensley asserts that there are no arguably meritorious claims he can raise on Father's behalf. In a brief accompanying his motion, Hensley identifies three potential issues for appeal: (1) whether the circuit court erred in extending guardianship beyond the termination of the wardship, (2) whether the circuit court's finding that Aidan's best interest warranted termination of the wardship was against the manifest weight of the evidence, and (3) whether the circuit court violated Father's rights by holding three permanency hearings at

11

which Father was not present. Hensley concludes that all three potential arguments lack merit, and we agree.

¶ 38    We first address the propriety of extending the guardianship beyond the termination of the wardship. As we discussed earlier, the circuit court raised this question at the dispositional hearing. However, the Juvenile Court Act of 1987 (Juvenile Court Act) expressly provides that when a circuit court determines a wardship of the court is no longer necessary to serve the best interests of the child and decides to terminate the wardship, the circuit court "may at the same time continue or terminate any custodianship or guardianship theretofore ordered." 705 ILCS 405/2-31(2) (West 2024). In light of this clear statutory authority, we agree with Hensley that any argument to the contrary would be frivolous.

¶ 39    We next consider the question of whether the circuit court's decision was against the manifest weight of the evidence. Hensley contends that any argument that the decision in this case was against the manifest weight of the evidence would lack merit. We agree.

¶ 40    The circuit court has the discretion to set permanency goals and to make a final decision regarding what placement option serves the best interests of the child. *In re V.M.*, 352 Ill. App. 3d 391, 397 (2004). The circuit court may close the case and place the child in a private guardianship if it finds by a preponderance of the evidence that such a placement is in the child's best interests. *In re Kam. B.*, 2024 IL App (1st) 240599, ¶ 50. We will not overturn the circuit court's decision unless it is against the manifest weight of the evidence. *In re Kam. B.*, 2024 IL App (1st) 240599, ¶ 50; *In re V.M.*, 352 Ill. App. 3d at 397. There is a strong presumption in favor of the circuit court's child custody decisions. *In re Kam. B.*, 2024 IL App (1st) 240599, ¶ 50; *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20. We will find a decision to be against the manifest weight of the evidence if our review of the evidence in the record indicates that the opposite conclusion is

12

apparent or the circuit court's findings are arbitrary, unreasonable, or not based upon the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 41 In determining the child's best interests, the circuit court must consider several factors, including (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and familial, cultural, and religious ties; (4) the child's sense of attachment; (5) the child's wishes and long-term goals; (6) the child's ties to community, including school, church, and friends; (7) the need for permanence, including continuity in the child's relationships with siblings, parental figures, and other family members; (8) the uniqueness of each family and child; (9) the risks involved in substitute care; and (10) the preferences of people available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024). The circuit court may also consider the bond formed between the child and the foster parent over time. *In re Kam. B.*, 2024 IL App (1st) 240599, ¶ 53. The circuit court is not required to explicitly mention each of these factors in its decision. *In re Kam. B.*, 2024 IL App (1st) 240599, ¶ 53.

¶ 42 Here, the circuit court explicitly considered each of the statutory best interest factors. In particular, it found that Aidan's need for physical safety and welfare was being met in his placement with Brian (705 ILCS 405/1-3(4.05)(a) (West 2024)); that Aidan's ties to his family and his community were being maintained in Brian's home (705 ILCS 405/1-3(4.05)(c), (f) (West 2024)); and that the establishing the guardianship would allow Aidan to remain in the same home until he turned 18, thus satisfying his need for permanency (705 ILCS 405/1-3(4.05)(7) (West 2024)). The evidence supports these findings. Brian testified that Aidan was flourishing and doing very well. He further testified that he would not interfere in Aidan's relationship with Father and that he had been in contact with Amanda, who was caring for Aidan's younger brother.

13

¶ 43 Moreover, Father never raised any concerns about placing Aidan in Brian's care during the circuit court proceedings, nor did he challenge the need for substitute care due to his incarceration. The sole issue was whether Aidan would remain a ward of the court. Father argued before the circuit court that leaving the wardship open would give him the greatest opportunity to have a say in Aidan's life. However, as the circuit court observed, the fact that Aidan will turn 18 before Father is released from prison renders the goal of reunification unlikely and limits Father's realistic ability to override Aidan's decisions about his own future with or without a wardship. In addition, Father's parental rights to Aidan remain intact. For these reasons, we agree that the evidence supports the circuit court's decision and that any argument to the contrary would be frivolous.

¶ 44 Finally, we consider whether there is any arguably meritorious argument that the circuit court violated Father's rights by holding three permanency hearings at which he was not present, either in person or via video. A respondent parent has the right to be present at proceedings under the Juvenile Court Act. 705 ILCS 405/1-5(1) (West 2024). However, by failing to raise an issue in the circuit court, a party forfeits consideration of that claim on appeal. *In re Stephen K.*, 373 Ill. App. 3d 7, 22 (2007). Here, Father did not object to the permanency hearings being held in his absence, either through counsel at the hearings or subsequently in writing. The circuit court continued the proceedings to allow Father to be present at the final permanency hearing. Had Father objected to the earlier hearings being held in his absence, the court could have cured the error by continuing the hearings and seeking a video writ for his appearance. We therefore find that Father has forfeited any claim of error related to his absence at three permanency hearings. We conclude that there are no arguably meritorious claims for Hensley to raise on Father's behalf in this appeal.

14

¶ 45                                   III. CONCLUSION

¶ 46    For the foregoing reasons, we grant Hensley's motion to supplement the record on appeal

and his motion to withdraw as counsel. We affirm the order of the circuit court.


¶ 47    Motions granted; judgment affirmed.